GREAT LAKES CHEMICAL
CORPORATION,
Plaintiff,

v.

PHARMACIA CORPORATION, former-
ly known as Monsanto Company, and
Sweet Technologies, Inc., Defendants

C.A. No. 18276.

Court of Chancery of Delaware,
New Castle County.

Submitted Feb. 13, 2001.

Decided June 29, 2001.

Lawrence C. Ashby and Philip Trainer, Jr., of Ashby & Geddes, Wilmington, Delaware; and H. Roderic Heard, John E. Frey and Thomas M. Lynch, of Wildman, Harrold, Allen & Dixon, Chicago, Illinois, for Plaintiff.

Richard L. Horwitz and John M. Seaman, of Potter Anderson & Corroon, LLP, Wilmington, Delaware; and John W. Treece and Sheila A. Sundvall, of Sidley & Austin, Chicago, Illinois, for Defendants.

### OPINION

JACOBS, Vice Chancellor.

This lawsuit arises from the purchase of NSC Technologies Company, LLC, a Delaware limited liability company ("NSC") that was a subsidiary of the defendants, Pharmacia Corporation[1] ("Pharmacia") and Sweet Technologies, Inc.[2] The purchaser was the plaintiff, Great Lakes Chemical Corporation ("Great Lakes" or "the plaintiff"), which brought this lawsuit after the purchase, alleging that the defendants had committed fraud and breach of contract in connection with the NSC purchase. Now pending is the defendants' motion to dismiss all but one count of the complaint for failure to state a claim upon which relief can be granted. This Opinion decides that motion.

## I. FACTUAL BACKGROUND[3]

### A. Overview

NSC was a business unit of Pharmacia that was devoted to the commercial development and sale of highly specialized pharmaceutical intermediates and compounds used by NSC's customers to manufacture therapeutic drugs. At the time of the purchase transaction, NSC's business included the development and sale of L–Phenylalanine ("L–Phe") and a compound called "Tic–D." NSC was also involved in research and development of new products for the pharmaceutical market.[4]

In the fall of 1998, Pharmacia decided to sell NSC. Pharmacia engaged the investment banking firm of BancBoston Robertson Stephens to prepare a Confidential Descriptive Memorandum (the "Descriptive Memorandum") for use in marketing NSC to potential acquirers. The Descriptive Memorandum projected NSC's total sales at $93.2 million for 1999, increasing to $192 million by 2002.

---

1. Pharmacia, which was formerly known as Monsanto Company, is referred to in this opinion as "Pharmacia".

2. Pharmacia owned 81.5% of NSC, and Sweet Technologies Inc. owned 18.5%. Sweet Technologies Inc., together with Pharmacia, are referred to collectively as the "defendants" or "Pharmacia".

3. The facts recited herein are taken from the well-pled allegations of the complaint.

4. Pharmacia also manufactured L–Phe for its own use in the chemical manufacture of the artificial sweetener aspartame. In addition, it also provided L–Phe to NSC.

Great Lakes received the Descriptive Memorandum on November 10, 1998. Two days later, Great Lakes indicated its interest in submitting a bid for NSC, and the parties began negotiating the terms of a possible sale shortly thereafter.

To assist it in those negotiations, which lasted from November 1998 through early May 1999, Great Lakes engaged industry consultants from The Catalyst Group ("Catalyst") and the law firm of Kirkland & Ellis ("K & E"). Together, Catalyst and K & E conducted due diligence on NSC. On December 17, 1998 and January 15, 1999, Pharmacia made presentations to Great Lakes in an effort to promote the sale of NSC.

On January 15, 1999, Pharmacia notified Great Lakes that it was reducing its 1999 sales projections for NSC from $93.5 million to $78 million.

On January 22, 1999, Great Lakes offered to acquire NSC for approximately $130 million.

During the first quarter of 1999, NSC's actual sales fell below the projected level, reaching only $5 million–far below its actual sales for the same quarter in 1998. On March 16, 1999, as a result of the low first quarter figures, Pharmacia again reduced NSC's 1999 projected sales, this time from $78 million to $68.2 million, and so notified Great Lakes. By that point, Pharmacia had reduced NSC's projected 1999 sales by 27%.

In mid-April 1999, Great Lakes and Pharmacia entered into the Ownership Interest Purchase Agreement (the "Purchase Agreement") to buy NSC. The transaction closed on May 3, 1999, and NSC was sold to Great Lakes for a renegotiated price of $125 million.

## B. The Negotiations

The reason that the NSC sales projections were lowered was that during the negotiations, significant changes had occurred that affected NSC's business. Those changes resulted from price-cutting in the aspartame market, the failure of many smaller aspartame manufacturers, and the entry of new sellers of L–Phe into the pharmaceutical market. Those developments increased the number of NSC's competitors and affected NSC's customer base–changes that turned out to be permanent. Price competition in the aspartame market also reduced the price of L–Phe in the pharmaceutical market, which in turn drove smaller producers of aspartame, (including NSC's sole sweetener customer, Enzymologa), out of the artificial sweetener market altogether.[5]

NSC management had detailed knowledge of these developments and NSC's performance, but had only limited involvement in the sale negotiations. NSC management were instructed not to speak directly to Great Lakes' personnel (and vice versa). Instead, all inquiries were to be directed to Pharmacia's negotiators, who would obtain the requested information from NSC management and then respond to Great Lakes. Beginning in January 1999, Great Lakes agreed to direct all inquiries for NSC management to Jan Wolpert ("Wolpert"), a vice president of Pharmacia and the defendants' principal negotiator.

From January through April 1999, Great Lakes made several due diligence inquiries to Pharmacia about NSC's business, intellectual property, product markets, and its actual sales and sales forecasts for 1999–2002. Having very little experience in the pharmaceutical intermediates business, Great Lakes claims to have relied on Phar-

5.   In 1998, NSC's sales to Enzymologa exceed-    ed $3.5 million.

macia's experience in that business, particularly Pharmacia's representation concerning the events that affected NSC between January and April of 1999.

## C. The "Infringement" of NSC's Patent

NSC holds both United States and European patents on the manufacturing process of Tic–D. Plaintiff alleges that throughout the negotiations, the defendants had reason to know that Archimica, an Italian competitor of NSC in the Tic–D market, was interfering with and infringing NSC's patents.

In late January 1999, representatives of Catalyst received unverified information that a manufacturer of Tic–D in eastern Europe was using a manufacturing process identical to that covered by NSC's Tic–D process patent. When Catalyst asked Pharmacia's representatives if they knew of the alleged interference, the representatives said they did not and provided Catalyst and other Great Lakes' representatives with a diagram showing the various manufacturers of Tic–D, among them Archimica. When Catalyst specifically asked Pharmacia representatives whether Archimica or any of the other manufacturers was interfering with NSC's Tic–D process patent, Pharmacia responded that no interference had occurred, explaining that Archimica's manufacturing process was different from, and inferior to, NSC's process. The Purchase Agreement warrants that there had been no interference with or infringement of NSC's intellectual property.

## D. Defendants' Statements About NSC's Business

The plaintiff's fraud claims rest largely on alleged misrepresentations by the defendants in March and April 1999. It is claimed that Wolpert made the first of these misrepresentations during a March 15, 1999 telephone conference between Pharmacia negotiators and Great Lakes representatives. In that telephone conference, Great Lakes expressed concerns, particularly in light of NSC's actual sales for January and February 1999, about NSC's financial stability and NSC's projected sales of L–Phe and Tic–D. Mr. Wolpert responded that the reduced L–Phe sales resulted from temporary reductions in orders and from some accelerated shipments at the end of 1998. He attributed the reduced Tic–D sales to excess inventory of one of NSC's two customers over-ordering in 1998. Wolpert added that ultimately this would work to Great Lakes' benefit, because the shortfall reflected deferred sales that would be realized after Great Lakes purchased NSC.

After that meeting, NSC's financial statements were again revised downwards to show 1999 projected sales at $68.2 million—a reduction of $9.8 million. NSC's chief financial officer concluded that even $68.2 million was too high, given what the defendants knew about actual market conditions. Despite that (plaintiff alleges), NSC's president (who was also a Pharmacia employee) refused to lower the projections any further. On March 17, the reduced projections were presented to Great Lakes, with the assurance that NSC's sales would increase later in 1999 and that NSC would realize stronger sales in the coming years.

Besides the Purchase Agreement, NSC and Pharmacia entered into five transaction agreements. The transaction agreement that is relevant to this lawsuit is the Supply Agreement (the "Supply Agreement"), under which Pharmacia agreed to continue to manufacture, and NSC agreed to purchase, certain L–Phe products that are identified in a schedule attached to the Agreement.

After the parties negotiated a $5 million price reduction based on NSC's poor first quarter sales performance, the purchase of NSC by Great Lakes closed on May 3, 1999.

## II. THE PARTIES' CONTENTIONS AND THE RELEVANT STANDARD

In its complaint, Great Lakes alleges seven Counts, of which the defendants have moved to dismiss all but one (Count V). Count I alleges fraud in the inducement. Count II alleges breach of the Supply Agreement. Count III alleges common law fraud. Count IV alleges that Pharmacia breached the Purchase Agreement by warranting that there was no material adverse change to NSC's business when such changes had, in fact, occurred. Count VI claims indemnification for losses arising out of the breach of any representation or warranty. Count VII claims breach of a warranty that the defendants' ownership interests in NSC that were being sold to Great Lakes, were "securities" under the federal securities laws. The defendants have moved to dismiss these Counts for failure to state a claim upon which relief may be granted.

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the factual allegations of the complaint are accepted as true and the plaintiff is given the benefit of every reasonable inference to be drawn from those allegations.[6] If under these procedural ground rules Great Lakes pleads any set of facts that would entitle it to relief, then the motion must fail.[7] For the reasons that follow, I grant that motion in part and deny it in part.

## III. ANALYSIS

### A. Count II–Breach of the Supply Agreement

In Count II, Great Lakes claims that Pharmacia breached the Supply Agreement by failing to maintain the required "safety stock," which is defined in that Agreement as a quantity of L–Phe equal to one-sixth of the L–Phe shipped by Pharmacia to NSC during the previous year. Paragraph 9, which is the relevant provision of the Supply Agreement, provides:

> In order to provide Purchaser with a volume of Products for Purchaser's use as provided herein where an event of force majeure has occurred, within 16 weeks of the commencement of the Term, Monsanto shall ensure that Purchaser has on consignment, at a single Purchaser location designated by Purchaser, a quantity of Product equal to one-sixth of Product volume shipped by Monsanto to Purchaser during the immediately preceding calendar year. Purchaser shall not be obligated to pay for such safety stock, and title to such safety stock shall not pass to Purchaser, until the safety stock is used. Unless prevented by an ongoing event of force majeure, Monsanto shall replenish consignment safety stock inventory within twenty-one (21) days of Purchaser's written notice to Monsanto that it has fallen below the requisite volume of consignment safety stock inventory.

Pharmacia urges that Count II must be dismissed for three reasons. First, Pharmacia argues that the complaint does not allege that Pharmacia, in fact, failed to maintain the safety stock. Second, Pharmacia contends that its contractual duty was to maintain the safety stock *in a*

---

**6.** *In re USACafes, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991).

**7.** *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1263 (1979).

*location to be designated by Great Lakes,* and that because Great Lakes never identified a "single purchaser location," Pharmacia never breached that duty. Third, Pharmacia urges that Great Lakes has failed to state a claim because the Supply Agreement provides that Great Lakes is not entitled to draw against, or have access to, the safety stock unless "an event of *force majeure* has occurred." Pharmacia argues that because no *force majeure* condition precedent is claimed to have occurred, Great Lakes is not entitled to draw down or have access to the safety stock, for which reason the defendants' alleged failure to maintain the safety stock cannot be actionable.

Great Lakes responds that the Supply Agreement does not require it to declare a *force majeure* in order for Pharmacia's failure to maintain the safety stock to operate as a breach of the Supply Agreement. The reason, Great Lakes says, is that Pharmacia's obligation is to "maintain"–not "deliver"–the safety stock. Moreover, Great Lakes claims, it has suffered and continues to suffer injury from Pharmacia's breach by reason of its (Great Lakes') inability to offer competitive terms for its product and to maintain existing and gain new customers. Moreover, Great Lakes claims, it shortly will exhaust its L–Phe inventory, and as a result it would have to purchase L–Phe on the open market under terms and at prices that would be prohibitive.

■ I conclude that Count II fails to state a claim upon which relief may be granted, for two reasons. First, Great Lakes has not sufficiently pled that it suffered a cognizable injury resulting from the breach. An essential element of any claim for breach of contract is cognizable injury.[8] Great Lakes' claims that as a result of the breach, it has been unable (i) to offer competitive terms for its product, (ii) to maintain existing customers and (iii) to gain new customers. This claim, however, is a *non sequitur* because the injury does not logically flow from the breach. Nothing in the complaint links the alleged breach and the claimed injury, *i.e.,* alleges specifically in what way the breach of the Supply Agreement caused these claimed effects. Similarly defective is the claim that the defendants' continuing breach will cause Great Lakes to exhaust its L–Phe inventory and require it to purchase L–Phe on the open market under prohibitive terms and prices. That claim fails because the Supply Agreement itself states that the parties have a fixed price requirements contract.[9] If, in fact, the plaintiff is nearing the end of its L–Phe supply, all it need do is request more L–Phe from the defendant, which Pharmacia would be required to provide at the contract price.

The alleged injury is also causally unrelated to any alleged breach of duty to maintain the safety stock, because the Supply Agreement unambiguously provides that Great Lakes is not entitled to draw against the safety stock unless and until an event of *force majeure* has occurred. Because the complaint does not allege any such triggering event, Great Lakes has no right to draw against the safety stock. Any shortfall in product in the plaintiff's hands could not, therefore, be caused by the absence of safety stock. For that reason, Great Lakes has failed to plead a cognizable injury resulting from

---

8. *See, e.g., Winston v. Mandor,* Del. Ch., 710 A.2d 835, 840 (1997) ("In order to survive a motion to dismiss, plaintiff must demonstrate the existence of the contract, breach thereof and resultant damage.").

9. Supply Agreement, at 3.

the defendants' alleged breach of the Supply Agreement.

Second, Count II fails to state a claim because Great Lakes has not pled that it designated a single purchaser location to which Pharmacia was to transfer the safety stock. Without that designated location, Pharmacia could not perform its obligation to transfer the safety stock under the Supply Agreement. To the extent the breach is claimed to consist of Pharmacia's failure to maintain the safety stock, the breach would be one Great Lakes itself caused, by failing to perform its antecedent contractual duty to designate a "single purchaser location" where the safety stock could be maintained. Because Great Lakes has failed adequately to plead either a breach of the Supply Agreement or a cognizable injury, Count II will be dismissed.

## B. Count VII: Breach of Warranty Claims

In Count VII, Great Lakes alleges that Pharmacia warranted in Section 4.1(a) of the Purchase Agreement that the ownership interests Great Lakes purchased were "securities" under the federal securities laws. Because those ownership interests have since been determined not to be securities by a Federal District Court,[10] Great Lakes claims that Pharmacia is liable for breach of warranty.

■ Pharmacia responds that although Section 4.1(a) refers to its ownership interests in NSC as "equity securities," that reference, without more, cannot constitute a warranty that the ownership interests were "securities" for purposes of the federal securities laws.

Pharmacia's argument runs as follows: the title and thrust of Section 4.1(a) of the Purchase Agreement (which is headed "Title to Ownership Interests") is that Pharmacia held valid legal title to its ownership interests in NSC that were being sold. That Section contains specific warranties that (1) Pharmacia held legal title to the ownership interests, (2) the interests were not encumbered, and (3) there were no voting agreements outstanding with respect to the ownership interests. Nowhere does § 4.1(a) provide that Pharmacia's ownership interests in NSC constitute "securities" within the meaning of the federal securities laws.

Pharmacia is correct. Section 4.1(a) of the Purchase Agreement warrants that Pharmacia held legal title to the ownership interests in NSC and had the legal ability to transfer those interests to Great Lakes. Although the ownership interests are referred to in Section 4.1(a) as equity securities, Great Lakes has failed to articulate or demonstrate how that reference constitutes a warranty that the ownership interests were securities for purposes of the federal securities laws. Even viewing the inferences from the pled facts in the light most favorable to Great Lakes, the plaintiff cannot succeed on this claim under any set of circumstances. Count VII must therefore be dismissed.[11]

## C. Counts I and III: The Fraud Claims

### 1. *The Fraud Claims Summarized*

In Counts I and III, Great Lakes claims that Pharmacia fraudulently induced it to enter into the Purchase Agreement and to agree to pay more for NSC than it was

---

**10.** *Great Lakes Chemical Corp. v. Monsanto Co.*, 96 F.Supp.2d 376 (D.Del.2000).

**11.** Because I find that § 4.1(a) of the Purchase Agreement does not warrant that the

ownership interests were securities for purposes of the federal securities laws, I do not reach the issue of whether Great Lakes has sufficiently pled damages.

worth. The complaint alleges that Pharmacia made the following material misrepresentations and omissions:

First, the plaintiff claims that the

(a) "Defendants concealed from Great Lakes material changes in the L–Phe and aspartame markets, the immediate negative effects that those changes were having on NSC's sales, and the permanent effects that the changes would have on NSC's business in the future...." [12]

In support of this claim, Great Lakes alleges that reductions in aspartame prices by Pharmacia and other sweetener producers caused, in turn, a reduction in the market price of L–Phe. This decline in aspartame prices, plaintiff claims, also forced smaller aspartame manufacturers, including Enzymologa, a large NSC customer, to go out of business. Moreover, the plaintiff alleges, companies that historically supplied L–Phe to the sweetener industry began selling their product directly into the pharmaceutical market, which also resulted in a loss of sales. [13]

The plaintiff next claims that:

(b) "Instead of disclosing to Great Lakes the changes in NSC's business and their adverse effects, Defendants falsely represented to Great Lakes that NSC's declining sales were attributable to specific factors other than the changes ..." [14]

More specifically, Great Lakes alleges that Pharmacia told Great Lakes that NSC's reduced sales in the first quarter of 1999 were the result of "temporary" reductions in orders that reflected (i) "deferred sales" which would increase later that year, (ii) currency conversion issues that were "temporarily" impacting demand, (iii) accelerated shipment and posting of year-end orders in 1998 rather than in 1999, and (iv) the excess inventory of one of NSC's Tic–D customers. [15]

Lastly, the plaintiff claims that:

(c) "Defendants concealed from Great Lakes Archimica's interference with and infringement of NSC's patents, despite an express representation in the Purchase Agreement that no such interference or infringement was occurring ..." [16]

* * *

The above-described fraud claims are the subject of Counts I and III. In Count I, Great Lakes claims that it was induced by fraud to enter into the Purchase Agreement, and that it is entitled to equitable rescission of that Agreement. In Count III, Great Lakes claims that those same misrepresentations and omissions constitute common law fraud that entitles it to damages in excess of $50 million.

The defendants contend that these claims are legally defective on two separate grounds. First, the defendants argue that the numerous disclaimer provisions of the Purchase Agreement bar any claim of justifiable reliance on the alleged misrepresentations and omissions–an element essential to maintain the fraud claims. [17] The Purchase Agreement contains three specif-

12. Complaint, at ¶ 79(a).

13. *See*, Complaint, at ¶¶ 38–44.

14. Complaint, at ¶ 79(b).

15. *See*, Complaint, at ¶¶ 51–64.

16. Complaint, at ¶ 79(c).

17. *See DeBakey Corp. v. Raytheon Serv. Co.*, Del. Ch., C.A. No. 14947, 2000 WL 1273317, Jacobs, V.C., Mem. Op. at 55 (Aug. 25, 2000) (*citing Stephenson v. Capano Dev., Inc.*, Del. Supr., 462 A.2d 1069, 1074 (1983)).

ic written disclaimers. The first of these, Section 6.10, is very broad and reads:

> Section 6.10. *Confidential Memorandum, Etc.* The Buyer agrees that, except as expressly provided in this Agreement or the Transaction Agreements, neither the Sellers, the Company nor any other person or entity will have or be subject to any liability to the Buyer … resulting from the distribution to the Buyer, or the Buyer's use of the [Descriptive Memorandum] and any information, document, or material made available to the Buyer in certain "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement. In connection with the Buyer's investigation of the Company, the Buyer may have received from or on behalf of the Sellers certain projections, including projected statements of operating revenues and income from operations of the Company. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying [them]), and that the Buyer has received no representation or warranty from either Seller with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying [them]).

The second disclaimer appears in Section 4.29 of the Purchase Agreement, wherein Great Lakes agreed that:

> Except as set forth in this Article 4 or in the Disclosure Schedule or the exhibits hereto, neither Seller makes any representation or warranty, express or implied, to Buyer or its affiliates … relating to itself, Company, the other Seller … including, without limitation, any representation or warranty as to value, merchantability, fitness for a particular purpose or for ordinary purposes, or any other matter.[18]

The third disclaimer is found in the Descriptive Memorandum which pertinently provides that:

> "[n]one of [the sellers] make any express or implied representation or warranty as to the accuracy or completeness of the information contained herein or made available in connection with any further investigation of the Company;"[19] and that

> "[a]ll projections of financial or operating results are based on estimates made by NSC and there can be no assurance that such results will be realized."[20]

The Descriptive Memorandum further provides that:

> "[e]ach of [the Sellers] expressly disclaims any and all liability that may be based on such information or errors therein or omissions therefrom."[21]

The defendants argue that the above-quoted cautionary statements and disclaimers are unambiguous, that they should be enforced as written, and that as a matter of law they preclude any justifiable reliance by Great Lakes upon alleged statements or omissions regarding NSC's

---

**18.** Purchase Agreement, at § 4.29. Section 3.5 of the Purchase Agreement makes the same relevant disclaimers.

**19.** Descriptive Memorandum, at 1.

**20.** *Id.*

**21.** *Id.*

sales projections. By reason of these disclaimers, the defendants urge that any statements which involve the expected future market price of L–Phe, the future competition for NSC's products, expressions of belief regarding why NSC's sales decreased, predictions as to whether the decrease was "temporary," and opinions as to whether a known foreign competitor was infringing NSC's patents, could not be the subject of any justifiable reliance by Great Lakes. Alternatively, the defendants argue that even if the disclaimers do not apply, the fraud claims must nonetheless fail because Great Lakes has not sufficiently pled that Pharmacia knew that its representations or omissions were material or false, when they were made.

Great Lakes responds that its fraud claims are not defeated by the disclaimers in the Purchase Agreement, because those disclaimers do not apply. The disclaimers do not apply (Great Lakes says) because it does not claim to have relied on any of Pharmacia's forecasts, projections or predictions for NSC. Rather, Great Lakes claims that it relied on the defendants' statements, made in March and April 1999, concerning *past* and *current* events and conditions affecting NSC. By way of example, Great Lakes alleges that in the March 1999 teleconference, Great Lakes representatives expressed concern over NSC's reduced sales for January and February 1999, to which Pharmacia representatives responded that "the reduced ... sales were merely the result of temporary reductions in orders and some accelerated shipments at the end of 1998." [22] These statements, Great Lakes argues, were not forecasts or projections; rather, they explained the reasons for the *currently* low level of NSC's sales in January and February.

Alternatively, Great Lakes argues that even if the disclaimers in the Purchase Agreement are found to govern the alleged misrepresentations, they cannot operate to defeat the fraud claims as a matter of Delaware law. Finally, Great Lakes contends that it has sufficiently pled that the alleged misrepresentations were material and that Pharmacia knew they were false.

These arguments raise three issues. First, are the alleged misrepresentations and omissions covered by the disclaimers in the Purchase Agreement? Second, if they are covered, does Delaware law nonetheless preclude the contract disclaimers from barring fraud claims where the contract was entered into between sophisticated parties after extensive due diligence and negotiations? Third, if the contract disclaimers do not cover the alleged misrepresentations and omissions, has Great Lakes sufficiently pled that the misrepresentations and omissions were material and that Pharmacia knew they were false at the time they were made? I address these issues in that order.

2. *Do the Disclaimers Cover the Alleged Misrepresentations and Omissions?*

A reading of the disclaimers makes it plain that except where the Purchase Agreement otherwise specifically provides, Great Lakes agreed to prohibit itself from relying on any forecasts or predictions furnished by Pharmacia that were not otherwise the subject of a warranty in that Agreement. Here, the complaint alleges, Great Lakes relied on NSC's sales projections for 1999 and their underlying assumptions, which Great Lakes claims were not "forecasts" or "predictions." [23] The

---

**22.** Complaint, at ¶ 57.

**23.** There are several instances where Great Lakes alleges disclaimed wrongdoing, such

difficulty with this position, however, is that most of the alleged misrepresentations concern the *future,* not the *current* financial position of NSC. As such, they were necessarily forecasts or predictions of NSC's future business.

■ Predictions about the future cannot give rise to actionable common law fraud.[24] Nor can expressions of opinion.[25] Here, the alleged statements that the sales reductions were "temporary" amounted to a prediction that the sales would increase in the future, as did the alleged representation that "the full-year projections would be substantially met." Predictions about future events are covered by the disclaimers. And, the alleged statement that the "current financial posture justified the projections for future sales" is not actionable because it was an expression of opinion that the projections were adequately supported.

■ Somewhat more problematic is the allegation that Pharmacia's "negotiators attributed the first quarter diminished sales to *deferred orders* by certain customers...."[26] That statement appears at first blush to be more akin to a statement of present fact than to a prediction that the orders would be made in the future. But even if that statement was not covered by the disclaimers, Great Lakes would not

have been justified in relying on it for other reasons next discussed.

The complaint alleges that those representations were first made in a March 15, 1999 teleconference.[27] The complaint goes on to allege, however, that the very next day the defendants revised their *pro forma* financial statements for 1999, to reduce NSC's projected sales by $9.8 million.[28] The defendants then presented those revised projections to Great Lakes on March 17.[29]

Thus, assuming *arguendo* that on March 15th the defendants knew that the "deferred" sales would never materialize, and assuming the defendants had misrepresented that fact to Great Lakes, the defendants' contemporaneous reduction of their sales projections–which they promptly communicated to the plaintiff–put Great Lakes on notice of Pharmacia's belief that the sales would not rebound in 1999. Those revised projections negated the force of, and any justification Great Lakes might otherwise have had for relying upon, the alleged misrepresentation.

That conclusion is strengthened by the allegations that Great Lakes had retained industry experts (Catalyst) as well as top-flight legal advisors (K & E) to advise them. The complaint discloses that Great Lakes also knew that price-cutting was occurring in the aspartame market, and

---

as: (1) ¶ 21–"In light of the material facts known to Defendants ... such projections were unrealistic when made;" (2) ¶ 26–"Wolpert ... 'stood behind' the sales projections stated in the Offering Memorandum;" (3) ¶ 36–"Defendants emphasized to Great Lakes that NSC's L–Phe and Tic–D businesses were very strong and profitable.... Great Lakes therefore based its valuation of NSC largely on the sales *prospects* for L–Phe and Tic–D." (emphasis added).

24. *See Consolidated Fisheries Co. v. Consolidated Solubles Co.,* Del.Supr., 112 A.2d 30, 37 (1955).

25. *See Eastern States Petroleum Co. v. Universal Oil Products Co,* Del. Ch., 2 A.2d 138, 140 (1938) (*citing 5 Williston on Contracts,* (1937) §§ 1491, 1494).

26. Complaint, at ¶ 63.

27. Complaint, at ¶ 57.

28. Complaint, at ¶ 58.

29. Complaint, at ¶ 60.

that Great Lakes had available as resources, experts capable of understanding and communicating how that fact was significant to NSC's future sales prospects. Great Lakes and its advisors also knew that the 1999 sales projections had twice been reduced–from $93.2 million to $78 million, and then again to $68.2 million. Finally, Great Lakes conducted due diligence in accordance with a carefully drafted Purchase Agreement wherein it had agreed to perform–and to rely only upon–its own financial evaluation of NSC. For Great Lakes to now claim that it was justified in relying on a representation by the defendants that only one day later was undermined by a significant decrease in the defendants' sales projections, lacks support in the pled facts and is not actionable.

### 3. Does Delaware Law Prohibit the Disclaimers?

■ The plaintiff next argues that even if the disclaimers govern the representations on which it rests its fraud claims, Delaware law prohibits the use of such contract disclaimers to absolve claims of fraud. The plaintiff relies on *Norton v. Poplos*[30] for that proposition, but *Norton* is distinguishable. The cases cited in *Norton*, and the later cases that followed *Norton*, involved simple real estate contracts having boilerplate, unnegotiated disclaimer language. This case involves materially different facts. Here, two highly sophisticated parties, assisted by industry consul-

tants and experienced legal counsel, entered into carefully negotiated disclaimer language after months of extensive due diligence. The parties explicitly allocated their risks and obligations in the Purchase Agreement. In these quite different circumstances, a party to such a contract who later claims fraud is not in the same position–and does not have the same need for protection–as unsophisticated parties who enter into residential real estate contracts having boilerplate disclaimers that were not negotiated.

That distinction had been recognized by federal court decisions in Delaware and in other jurisdictions. In *J.A. Moore Construction Company v. Sussex Associates L.P.*,[31] the United States District Court for the District of Delaware held that a heavily negotiated contract between sophisticated parties precluded justifiable reliance on representations made outside, or inconsistent with, the controlling agreement.[32] In *J.A. Moore*, which involved a multi-million dollar construction contract, the court found that oral representations that conflicted with clear disclaimer provisions of the written contract could not be the subject of justifiable reliance by a plaintiff claiming fraud.

In *One–O–One Enters., Inc. v. Caruso*,[33] then-Circuit Judge Ruth Bader Ginsburg stated: "were we to permit plaintiffs' use of the defendants' prior representations ... to defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the

**30.** Del.Supr., 443 A.2d 1 (1982).

**31.** 688 F.Supp. 982 (D.Del.1988).

**32.** There, the court held that:
"To conclude that reliance was justifiable we would have to disregard a multimillion dollar written construction contract which was negotiated at arms-length and duly executed for plaintiff by Radish and then reexecuted by plaintiff's president ... four

months later.... The nature of the contracts and the parties, the amount of money involved, ant the formalities that attended the negotiations and execution preclude any genuine issue that plaintiff justifiably relied on defendants' promise that the contracts were not binding." 688 F.Supp. at 990–91.

**33.** 848 F.2d 1283, (D.C.Cir.1988).

paper on which they are written." Justice Ginsburg's observation applies equally to this case. Were this Court to allow Great Lakes to disregard the clear terms of its disclaimers and to assert its claims of fraud, the carefully negotiated and crafted Purchase Agreement between the parties would similarly not be worth the paper it is written on. To allow Great Lakes to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements. For those reasons, I conclude that in these circumstances, Delaware law permits explicit contract disclaimers to bar Great Lakes' fraud claims. Because the parties' contractually agreed-to disclaimers extinguish the fraud claims being asserted here, Counts I and III will be dismissed.[34]

## D. Count IV: Breach of Contract

In Count IV, Great Lakes claims that Pharmacia breached § 4.7(a) of the Purchase Agreement, because Pharmacia warranted that "there has been no change in the business of the Company which would have a Material Adverse Effect,"[35] and because such changes had, in fact, occurred.

Specifically, Great Lakes claims that four specific changes in the business occurred between December 31, 1998 and the May 3, 1999 closing date, changes that had a material adverse effect ("MAE") on NSC's business that resulted in a breach of § 4.7(a). The first was drastically diminished sales of L–Phe and Tic–D to significant customers. The second consist-ed of Archimica's undisclosed use of a Tic–D manufacturing process that infringed NSC's rights and Archimica's resultant acquisition of all of NSC's business. The third MAE consisted of steep price discounting, by Pharmacia and others, of the price of aspartame in the sweetener market, which resulted in significantly lower prices and reduced demand for NSC's product. The fourth MAE is said to have consisted of the catastrophic deterioration in the financial stability of, and concomitant lost sales to, NSC's sole sweetener market customer, Enzymologa, as a result of the price-cutting in the sweetener market.

Pharmacia argues that this claim is legally insufficient, because the plaintiff has not adequately pled that it breached § 4.7(a) of the Purchase Agreement. Although Pharmacia concedes that it warranted against the occurrence of certain *internal* material changes at NSC, it urges that the changes alleged by Great Lakes were *external* market changes and problems at other companies–changes that were not the subject of any MAE warranty.

In support, Pharmacia points to § 4.7(a)(i) through (xv) of the Purchase Agreement, which lists fifteen specific items against which Pharmacia warranted and that involved discrete internal company changes. Those listed items show (Pharmacia argues) that § 4.7(a) was not intended to create a universal, all-encompassing warranty against any and all marketplace changes. Rather, Pharmacia urges, when § 4.7 is read together with the warranty disclaimers found in Sections 4.29 and 6.10, the only sensible and harmo-

---

**34.** Because I have found that based on the contract disclaimer language and that the plaintiff was not entitled to justifiably rely on the defendants' statements, I will not discuss whether Great Lakes has sufficiently pled that the misrepresentations and omissions were material and that Pharmacia knew they were false at the time they were made.

**35.** Purchase Agreement at § 4.7(a).

nious interpretation of these provisions is that (i) Pharmacia disclaimed responsibility for any material adverse changes that were *external* to the business of NSC that might affect NSC's future sales or profits, and that (ii) Great Lakes took "full responsibility" for evaluating such external factors and their potential impact.

Although Pharmacia's interpretation may ultimately prevail on a developed factual record, I am unable at this stage to conclude that that interpretation is the only correct one as a matter of law.

■ In § 4.7(a) of the Purchase Agreement, Pharmacia warranted that "there has been no change in the business of the Company, which would have a Material Adverse Effect." Pharmacia further warranted that none of the fifteen specifically listed internal changes to NSC's business had occurred. An MAE is defined in the Purchase Agreement as "a negative effect or negative change on the operations, results of operations or condition (financial or otherwise) in an amount equal to $6,500,000 or more."[36] The issue presented by Count IV is whether the changes that are the subject of that Count are changes in *"the business of the Company"* and therefore covered by Pharmacia's warranty. At this procedural stage, I need only find that Great Lakes' construction of § 4.7 could entitle it to relief under the facts pled in the complaint. Because I find that Count IV states a claim for relief, for the reasons that follow I will deny Pharmacia's motion to dismiss Count IV.

Pharmacia urges that § 4.7(a) distinguishes between internal and external changes. On its face, however, that provision makes no such distinction. It paints with a broad brush and appears to include all effects or changes above the $6.5 million threshold amount. Had the parties intended to exclude from that provision's scope all external events that materially affect the Company's business, they could have included such an express limitation in their Agreement. They did not, however. As Vice Chancellor Strine, interpreting a similar MAE clause, stated in *IBP, Inc. v. Tyson Foods, Inc.:*

> "[the] disclaimers were far too general to preclude industry-wide or general factors from constituting a Material Adverse Effect. Had IBP wished such an exclusion from the broad language of § 5.10 it should have bargained for it."[37]

Here, as in *IBP,* the MAE clause also uses the broad "business of the Company" formulation. One reasonable inference from such a broadly worded definition is that price cutting in the market, patent infringement by a competitor, diminished sales that resulted from these events, and the loss of a major customer due to market forces, could fall within the scope of the term "business of the Company." The reason is that those specific events directly affected NSC's business. To repeat, although that inference may be found incorrect on a fully developed factual record, at this stage the inference is reasonable and must be credited.

■ Finally, Pharmacia contends that Great Lakes has failed adequately to plead resulting damages. I conclude, however, that the allegation that plaintiff has suffered damages in excess of $50 million is sufficient under Delaware's notice pleading standard.

---

**36.** Purchase Agreement, § 12.15.

**37.** *IBP, Inc. v. Tyson Foods, Inc.,* Del. Ch., C.A. No. 18373, —— A.2d ——, Strine, V.C., Mem. Op. at 106 (June 15, 2001).

## IV. CONCLUSION

For the reasons set forth herein, the defendants' motion to dismiss the complaint is GRANTED as to Counts I, II, III and VII, and is DENIED as to Counts IV and VI.[38] IT IS SO ORDERED.

---

**38.** The parties agree that Count VI is not an independent claim for relief, but instead requires that either Count II or IV survive. Because Count IV survives the motion to dismiss to that extent, plaintiff's claim for indemnification in Count VI also survives.