# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COCA-COLA BEVERAGES FLORIDA HOLDINGS, LLC; COCA-COLA BEVERAGES FLORIDA, LLC; CARDINAL SYSTEM HOLDINGS, LLC f/k/a Cardinal System Holding Company, LLC; and TROY D. TAYLOR, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0243-AGB |
| REGINALD GOINS, | ) ) ) | |
| Defendant/ Counterclaimant, | ) ) ) | |
| v. | ) ) ) | |
| COCA-COLA BEVERAGES FLORIDA HOLDINGS, LLC; COCA-COLA BEVERAGES FLORIDA, LLC; CARDINAL SYSTEM HOLDINGS, LLC f/k/a Cardinal System Holding Company, LLC; and TROY D. TAYLOR, | ) ) ) ) ) ) ) ) | |
| Counterclaim Defendants, | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

WHEREAS:[1]

A.     Reginald Goins is a former employee of The Coca-Cola Company, where he held management positions in sales, marketing, operations, and finance from 1998 through July 2014.  Troy Taylor wanted to own a Coca-Cola bottling franchise but "for more than 10 years his efforts had been fruitless," allegedly due to his lack of operational bottling experience.[2]

B.     In late 2011 or early 2012, after Taylor reached out to Goins, the two of them petitioned The Coca-Cola Company to acquire a bottling franchise.  The plan was for Taylor to be in charge of raising funds for the acquisition and Goins to be in charge of the operational side of the business.

C.     On October 15, 2013, after Goins and Taylor made multiple presentations to executives of The Coca-Cola Company, it signed a letter of intent to sell a franchise for a territory in Central Florida.  Goins was not named in the purchase agreement because he was still employed with The Coca-Cola Company, which "did not want to appear to give an 'insider' an advantage in petitioning for

---

[1] The facts recited herein are taken from the Amended and Supplemental Counterclaims ("Amended Counterclaims") filed on October 3, 2018 (Dkt. 44), and documents incorporated therein.  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss.) (internal quotation marks omitted).

[2] Am. Countercl. ¶ 1.

franchises," "but it was understood that The Coca-Cola Company expected Goins to be an owner."[3] In July 2014, Goins moved from Ohio to Florida to work full-time on "standing up" the new business.

D. On January 15, 2015, Taylor formed Coca-Cola Bottling Company of Central Florida, LLC, now named Cardinal System Holding Company, LLC ("Cardinal"), to serve as a holding company for the Central Florida franchise. On January 26, 2015, Taylor formed Coca-Cola Beverages Florida, LLC ("Beverages") to conduct the operations of the Central Florida franchise. Since approximately January 2015, Goins continuously asked Taylor to document their equity agreement but "Taylor continually delayed and gave excuses for his failure to provide the documents to Goins."[4]

E. In May 2015, The Coca-Cola Company closed on the sale of the Central Florida franchise. Goins officially became an employee of Beverages that month and executed an Employment Agreement with Beverages on November 16, 2015.

F. On October 21, 2015, Beverages entered into a letter of intent with The Coca-Cola Company to expand its territory into North Florida, which closed in October 2016. On December 9, 2015, Beverages entered into a letter of intent to expand its territory into South Florida, which closed in March 2017.

---

[3] *Id.* ¶¶ 42-43.

[4] *Id.* ¶ 57.

3

G.     On July 8, 2016, Taylor formed Coca-Cola Beverages Florida Holdings, LLC ("Holdings"), which owns all of the equity of Beverages. Goins was not consulted with respect to the formation of Holdings nor allowed to negotiate the terms of its operating agreement (the "LLC Agreement").[5] Taylor is named as the Manager of Holdings under the LLC Agreement, which provides that the Manager shall not have any fiduciary duties to the fullest extent permitted by law.[6]

H.     On August 24, 2016, Taylor and his attorney provided Goins with a Restricted Unit Agreement ("RUA"), which Goins executed the next day, a deadline that Taylor imposed on Goins.[7] The RUA grants 1,235 Class B Common Units of Holdings to Goins, representing approximately 11% of the total equity of Holdings, subject to a vesting schedule (described below) for the units that is subdivided into six components: (1) base amount (225 units); (2) sales (262 units); (3) gross profit (262 units); (4) EBITDA (262 units); (5) North Florida expansion (112 units); and (6) South Florida expansion (112 units).[8]

I.     Units for the base component are tied to achieving annual sales volume targets of cases sold for each calendar year between 2015 and 2019, and vest on May

---

[5] *Id.* ¶¶ 77-79.

[6] Compl. Ex. B ("LLC Agreement") §§ 7.1, 15.8.

[7] Am. Countercl. ¶¶ 81-82.

[8] *Id.* ¶¶ 85-88; Compl. Ex. A ("RUA") § 2(a)-(f).

4

31 of the following year. Units for the sales (measured in revenues), gross profit, and EBITDA components are tied to achieving certain financial thresholds for each calendar year between 2015 and 2024, and vest on the date that Taylor, as the manager of Holdings, determines whether or not these metrics have been met. Units for the North and South Florida components are tied to Holdings' expansion into those territories, and vest over two years: 50% on the first anniversary of each closing and the remaining 50% on the second anniversary of each closing.

J. In December 2016, Taylor told Goins that Goins should set an example as an equity owner and waive his 2016 bonus of $150,000 (half of his salary) because Beverages was not hitting all of its targets. Goins agreed to do so.

K. In October 2017, "Taylor unilaterally changed all of the vesting targets in Goins' RUA starting with 2017."[9] Around November 10, 2017, Taylor notified Goins of Taylor's intention to terminate Goins' employment with Beverages. On December 11, 2017, Taylor provided Goins a revised draft of a separation agreement, which indicated that Goins' employment was expected to end on or about May 10, 2018, that the fair market value of Goins' vested units was $0, and that his unvested units would be forfeited for no consideration.[10] On that same date, Taylor

---

[9] Am. Countercl. ¶ 90.

[10] *Id.* ¶ 102; Countercl. Defs.' Opening Br. Ex. A ¶¶ 1(a), 5(c).

provided Goins a copy of Beverages' audited financial statements for 2015 and 2016 that were prepared by Ernst & Young.

L. On March 6, 2018, Goins was terminated by Beverages.[11]  On March 7, 2018, Goins received a notice from Holdings that it was exercising its right to repurchase 133 vested units valued at $0 per unit and that Goins retained 112 vested units that were not being repurchased but that Holdings reserved the right to repurchase at a later date.[12]  The 112 vested units that were not repurchased in March 2018 were repurchased later in the year, in July (56 units) and November (56 units), for $0 per unit.[13]  The notice Goins received in March also stated that 990 of the units were unvested and automatically forfeited by Goins to Holdings.

M. On March 12, 2018, Goins filed a lawsuit in Florida state court asserting a variety of claims against Taylor, Beverages, Holdings, and Cardinal (collectively, the "Taylor Parties").  On April 3, 2018, the Taylor Parties filed this action.  Later, after this court expedited consideration of a motion to enjoin Goins from pursuing his claims in the Florida action in light of a Delaware forum selection clause, Goins agreed to stay the Florida action pending a resolution of this case.[14]

---

[11] Am. Countercl. ¶ 104.

[12] *Id.*

[13] *Id.* ¶ 109; Countercl. Pl.'s Opp'n Br. 15 n.3.

[14] *See* Dkt. 34.

6

N.     On June 29, 2018, Goins filed his answer and counterclaims, which he amended on October 3, 2018. The Amended Counterclaims assert six claims. On November 21, 2018, the Taylor Parties moved to dismiss the Amended Counterclaims in their entirety under Court of Chancery Rules 9(b) and 12(b)(6).

NOW THEREFORE, the court having considered the parties' submissions, IT IS HEREBY ORDERED, this 4th day of June, 2019, as follows:

1.     The standards governing a motion to dismiss for failure to state a claim for relief under Court of Chancery Rule 12(b)(6) are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[15]

To plead a claim for fraud, Court of Chancery Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity."[16] This includes alleging "the time, place, and contents of the false representation."[17]

2.     **Count I.** This claim asserts that Holdings and Taylor breached the RUA and the LLC Agreement in essentially two respects: first, by acting in bad

---

[15] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[16] Del. Ch. Ct. R. 9(b).

[17] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

7

faith in determining the *value* of the 245 units that Holdings purported to repurchase from Goins and, second, by failing to accurately determine the *number* of vested units that Goins was entitled to receive.[18] The motion to dismiss Count I is **DENIED** in part and **GRANTED** in part.

3.     Count I fails to state a claim for relief under the LLC Agreement because the Amended Counterclaims do not identify any provision of that contract that allegedly was breached.[19] Count I also fails to state a claim for relief under the RUA with respect to determining the *number* of vested units that Goins was entitled to receive. As Goins acknowledges, that issue is the basis of an implied covenant claim under the RUA, but is not covered by an express provision of the RUA.[20]

4.     With respect to determining the *value* of the 245 units that Holdings purported to repurchase from Goins, the Amended Counterclaims state a claim for relief against Holdings. The RUA affords Holdings the right to repurchase vested units from Goins after the termination of his employment at their "Fair Market Value," but exercise of that right is subject to the obligation of the Manager of Holdings (*i.e.*, Taylor) to determine the Fair Market Value of the units "in good

---

[18] *See* Am. Countercl. ¶ 139.

[19] *See US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *5-7 (Del. Ch. June 18, 2018), *aff'd*, 202 A.3d 510 (Del. 2019) (dismissing breach of contract claim under Rule 12(b)(6) for failing to identify a contractual provision that was breached).

[20] Tr. 98 (Mar. 21, 2019).

faith."[21] The Amended Counterclaims allege facts from which it is reasonably conceivable that Goins would be entitled to obtain a recovery from Holdings for acting in bad faith to purchase 245 concededly vested units for $0.

5. For a contractual bad faith claim to survive a motion to dismiss, one must only allege "facts related to the alleged act taken in bad faith, and a plausible motivation for it."[22] At the pleadings stage, allegations of bad faith conduct should not be considered piecemeal, but instead should be considered in their totality.[23]

6. The alleged facts and circumstances here, viewed in their totality, give rise to a reasonable inference of bad faith in valuing Goins' units under the RUA to support a claim for relief. They include that: (i) Taylor, who with his family beneficially owned all of the other units of Holdings, had a blatant conflict of interest

---

[21] RUA §§ 1(g), 3(d)(i).

[22] *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718, at *7 (Del. Ch. Dec. 9, 2011) (quoting *Winston v. Mandor*, 710 A.2d 835, 844 (Del. Ch. 1997)).

[23] *Klein v. Wasserman*, 2019 WL 2296027, at *5 & n.34 (Del. Ch. May 29, 2019) (collecting cases). In an effort to minimize some of Goins' allegations, the Taylor Parties rely on *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *6 (Del. Ch. Aug. 30, 2013), where the court viewed certain valuation data points as too far removed in time from the transaction at issue to make it reasonably conceivable that the units in question had a fair market value greater than $0. Like the other cases cited in *Klein*, however, *Stewart* recognizes that allegations bearing on a contractual bad faith claim must be viewed in their totality. *Id.* at *7. As discussed above, the totality of the allegations in the Amended Counterclaims makes it reasonably conceivable that Holdings breached its contractual obligation to value Goins' units in good faith. Indeed, many of the allegations here mirror those in *Stewart* that were found sufficient, in their totality, to plead a claim of contractual bad faith, including allegations concerning the self-interested motive for bad faith action. *Id.* at *8.

in determining the value of Goins' units for the purpose of eliminating his interest in Holdings;[24] (ii) based on a 6x multiple of Holdings' 2017 EBITDA, which was the multiple used to purchase the franchise territories from The Coca-Cola Company and which is a multiple permitted under the RUA (albeit the upper limit), the units allegedly were worth $26,124 per unit;[25] (iii) Taylor repeatedly reassured Goins about the value of his equity in Holdings;[26] (iv) Taylor needed Goins to obtain the Florida franchises because of his operational experience and opportunistically timed his termination to occur soon after Holdings had acquired and established its operations in all three territories;[27] and (v) Holdings failed to provide Goins with any documentation or analysis to support a $0 valuation for his units.[28]

7.    Finally, Count I fails to state a claim against Taylor for breach of the RUA. Taylor is not named as a party to the RUA, which was "made and entered into . . . by and between" Holdings and Goins, and which Taylor signed on behalf of Holdings only in his capacity as its Manager.[29] Although Taylor was responsible under the RUA as Holdings' Manager at the time to determine the value at which

---

[24] *See* LLC Agreement, Sched. 3.1 (reflecting that Cardinal and Taylor personally held all of the units of Holdings at its formation); Am. Countercl. ¶ 16.

[25] Am. Countercl. ¶¶ 126, 128-29.

[26] *Id.* ¶¶ 4, 7, 58, 66, 89, 130.

[27] *Id.* ¶¶ 1, 27, 30, 32-35, 37, 39-40, 64, 75, 93, 95-96, 98.

[28] *Id.* ¶ 105.

[29] RUA at 1, 16.

Holdings could repurchase Goins' units, that designation does not make him personally liable for breaches of the RUA because Taylor was not made a party to the RUA.[30]

8. **Count II.** This claim asserts that Holdings and Taylor breached the implied covenant of good faith and fair dealing in the RUA by failing to accurately determine the *number* of vested units that Goins was entitled to receive.[31] The motion to dismiss Count II is **DENIED** in part and **GRANTED** in part.

9. According to Holdings, Goins was vested before his termination in only 245 of the 1,235 units that were granted to him under the RUA. Goins contends that

---

[30] *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract. Indeed, Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually.") (internal footnote omitted). Goins provides no authority or logical reason why the court should deviate from this well-established principle simply because the RUA provides that it "should be read in conjunction with, and is subject to, the LLC Agreement." RUA at 1.

[31] Am. Countercl. ¶ 150. This allegation also asserts that Holdings breached the implied covenant in determining the value of his units, but Goins correctly acknowledges that "the implied covenant does not apply" to this issue, which is the subject of an express obligation to act in good faith. Countercl. Pl.'s Opp'n Br. 37-38; *see also Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015) ("The implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract.") (internal alteration and quotation marks omitted).

11

he was entitled to be vested in 568.6 units.[32]  To frame the analysis, two charts depicted below illustrate the parties' disagreements on the number of vested units, by time period and the relevant component:

| HOLDINGS' POSITION (Total = 245 units) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Base | Sales | Gross Profit | EBITDA | North Florida | South Florida | Date |
| 2015 | 45 | 13.1 | 26.2 | 0 | — | — | Closing |
| 2016 | 22.5 | 13.1 | 13.1 | 0 | 56 | 56 | 1st Anniv. |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 2nd Anniv. |

| GOINS' POSITION (Total = 568.6 units) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Base | Sales | Gross Profit | EBITDA | North Florida | South Florida | Date |
| 2015 | 45 | 26.2 | 26.2 | 0 | — | — | Closing |
| 2016 | 45 | 26.2 | 26.2 | 26.2 | 56 | 56 | 1st Anniv. |
| 2017 | 45 | 26.2 | 26.2 | 26.2 | 56 | 56 | 2nd Anniv. |

10.    Taylor, as the Manager of Holdings, had "full discretionary authority and power to construe [Holdings'] rights and obligations under [the RUA]," including to determine whether the various targets for the vesting of Goins' units were met.[33]  This discretion, however, must be exercised in good faith.[34]

---

[32] The court expresses no opinion on the question of what relief would be warranted if Goins were to establish an entitlement to more than 245 units, *i.e.*, more units than Holdings purported to repurchase from Goins.

[33] RUA § 1(g).

[34] *See Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 (Del. 2019) (recognizing that the covenant of good faith and fair dealing often comes into play "when a party to the contract is given discretion to act as to a certain

12

11.   **2015 Sales Component.** Goins concedes that 2015 sales were lower than the "annual" target set by the RUA, but argues that Holdings acted in bad faith by failing to prorate the 2015 sales target given that Beverages was operational for only seven months in 2015 and that the sales target would have been met if it had been prorated.[35]   For support, Goins contends that the 2015 target for another component (gross profit) was prorated.[36]   The facial logic of applying proration under the circumstances and the alleged proration to at least one other component for 2015 makes it reasonably conceivable that Holdings breached the implied covenant of good faith and fair dealing by failing to prorate the 2015 sales target.

12.   **2016 Base, Sales, Gross Profit, and EBITDA Components.** With regard to the 2016 base units, Goins alleges that while he was employed at Holdings, "Goins had access to the documents that showed that the 2016 target was satisfied."[37] Goins also alleges that sales and gross profit for 2016 exceeded their RUA targets based on Beverages' audited financial statements for that year, which Goins received

---

subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms").

[35] Am. Countercl. ¶ 116.

[36] According to Goins, the 2015 gross profit target must have been prorated because it was deemed to have been met even though the target in the RUA was $142,233,000 and the actual 2015 gross profit was only $83,773,000, which would have exceeded a prorated seven-month target of $82,969,000. Countercl. Pl.'s Opp'n Br. 41; *id.* Ex. 5 at 4; RUA at 6.

[37] Am. Countercl. ¶ 113.

in February 2017, and that EBITDA exceeded its RUA target for 2016 based on Taylor's own calculation.[38] These allegations are sufficient to support a reasonably conceivable claim that Holdings breached the implied covenant of good faith and fair dealing by not fully vesting Goins' units for the 2016 base, sales, gross profit, and EBITDA components.[39]

13. **2017 Sales, Gross Profit, and EBITDA Components.** The RUA does not specify a date certain on which these components are supposed to vest. Rather, the RUA provides that they "shall vest, if at all, on the date following the performance year . . . on which the Manager determines performance for that year."[40] In other words, the RUA affords the Manager discretion to determine the timing of vesting for each of these three components.

14. Two issues are at play with respect to these three components: first, as of March 6, 2018, the termination date of Goins' employment, Taylor had not yet determined if any units for these components had vested for calendar year 2017; and, second, Taylor unilaterally changed the targets for these components in October 2017. With respect to the first issue, Goins alleges that (i) he fully performed his

---

[38] *Id.* ¶¶ 117, 120, 123.

[39] Goins' Answer admits that "certain of Taylor's unilaterally set targets were not met." Ans. ¶ 68 (Dkt. 37). This admission does not change the court's conclusion as the Answer did not specify which of the targets was not met and, as the above chart shows, Goins concedes that the EBITDA target for 2015 was not met.

[40] RUA § 2(b), (c), and (d).

14

duties for the 2017 calendar year and thus should have been compensated for that work;[41] (ii) unaudited financial statements for 2017 were available by at least mid-February 2018 that Taylor could have used to determine if the targets for these components had been met before the effective date of Taylor's termination;[42] and (iii) for reasons explained previously, Taylor had a blatant conflict of interest in delaying the timing of his vesting determination for these components, particularly once the three Florida franchises had been acquired. With respect to the second issue, Goins alleges that (i) the 2017 targets were adjusted right before Goins was informed that he would be fired;[43] (ii) although Taylor had the discretion to adjust these metrics after the acquisition of additional territories, "[t]he increase was not proportional to the size of these additional territories that were added after 2015" and "Taylor agreed that he set the metrics too high, but never revised the metrics;"[44] and (iii) had the metrics been adjusted in a proportional manner, the 2017 sales, gross profit, and EBITDA goals would have been met.[45] These allegations, considered collectively, are sufficient to support a reasonably conceivable claim that Holdings

---

[41] Am. Countercl. ¶ 112.

[42] *Id.* ¶ 110; Countercl. Defs.' Opening Br. Ex. D. The RUA does not require the use of audited financials to determine if the vesting targets have been satisfied. Tr. 128-29.

[43] Am. Countercl. ¶¶ 118, 121, 124.

[44] *Id.*

[45] *Id.*

breached the implied covenant of good faith and fair dealing by not fully vesting Goins' units for the 2017 sales, gross profit and EBITDA components.

15. **2017 Base Component and the Territory Expansion Components.** These components operate differently than the ones addressed in Paragraphs 13-14 because they each are scheduled to vest, if at all, on specific dates under the express terms of the RUA. The 2017 base component would vest, if at all, on May 31, 2018.[46] The territory expansion components at issue would vest, if at all, on the second anniversary of the closings for those transactions, *i.e.*, in October 2018 for the North Florida franchise and in March 2019 for the South Florida franchise.[47] The RUA also expressly provides that "all unvested Class B Common Units shall immediately terminate and be forfeited without consideration" upon termination of Goins' employment "for any reason other than death or Disability."[48] Goins' implied covenant claim cannot be invoked to override these express provisions of the RUA and thus fails to state a claim for relief with respect to the 2017 base component and the components marking the second anniversary of the closings for

---

[46] RUA § 2(a).

[47] *Id.* §§ 2(e)(i), 2(f)(i); *see also* Am. Countercl. ¶¶ 71, 73.

[48] RUA § 3(b)(i).

16

the North and South Florida expansions.[49] Finally, Goins' claim against Taylor for breach of the implied covenant of good faith and fair dealing in the RUA fails because the "implied covenant . . . only potentially binds parties to an agreement" and, for the reasons discussed above, Goins was not a party to the RUA.[50]

16. **Count III.** This claim asserts a breach of the implied covenant of good faith and fair dealing against Holdings and Taylor under the LLC Agreement, but no such argument was advanced during briefing.[51] Accordingly, this claim has been waived and the motion to dismiss Count III is **GRANTED**.

17. **Counts IV-VI.** These three claims for unjust enrichment (Count IV), quantum meruit (Count V), and fraud (Count VI) all concern just one subject: the potential $150,000 bonus for 2016 that Goins did not receive.[52] Goins' eligibility for this bonus is governed by his Employment Agreement, which states that:

> For each such fiscal year, your target bonus will be 50% of the Base Salary [of $300,000], with the actual amount of any such bonus being determined by the CEO or the Board in his or its discretion, based on

---

[49] *See Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (explaining that an implied covenant "cannot be invoked to override the express terms of a contract") (quotation omitted).

[50] *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *11 (Del. Ch. Sept. 30, 2011); *see also Supra* ¶ 7.

[51] *See* Tr. 117; *see also Emerald Pr's v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[52] Tr. 117.

your performance and that of the Company against such goals as may be established by the CEO or the Board.[53]

The motion to dismiss Counts IV and V is **GRANTED** because the terms of an express contract govern any alleged entitlement Goins had to a bonus for 2016.[54]

18.    It is difficult to pin down the factual basis for Goins' fraud claim. Count VI alleges that "[i]n late 2016, Taylor fraudulently induced Goins to forgo a substantial bonus by telling Goins that because he was an equity owner with great value, he should set an example for the employees and not take a bonus."[55]   To the extent that Goins contends he was misled by the statement that "he was an equity owner with *great value*," the alleged misrepresentation is too vague and indefinite as to constitute a misrepresentation of *fact* to support a claim for fraud.[56]

---

[53] Compl. Ex. C at Ex. A § 2(b).

[54] *See Ameristar Casinos, Inc. v. Resorts Int'l Hldgs., LLC*, 2010 WL 1875631, at *13 (Del. Ch. May 11, 2010) ("Under Delaware law, courts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint that there exists an express contract that clearly controls.  And when the complaint alleges an express, enforceable contract that controls the parties' relationship, . . . a claim for unjust enrichment will be dismissed.") (internal footnote, alterations, and quotation marks omitted).

[55] Am. Countercl. ¶ 183.

[56] *See Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014) (stating that one of the requirements for pleading fraud is pleading that "the defendant falsely represented or omitted *facts* that the defendant had a duty to disclose") (emphasis added); *see also Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (stating that "expressions of opinion" cannot "give rise to actionable common law fraud").

19. Count VI also references an email that Taylor sent to Goins in January 2015 (and resent in May 2015) as "prior representations of value" that were made to Goins.[57] The statements in the January 2015 email bearing on value, however, appear to be nothing more than predictions and opinions, which legally cannot support a fraud claim.[58] These predictions were made, moreover, nearly two years before the subject of a bonus arose in late 2016. As such, it cannot reasonably be inferred that these statements were made with the intention to induce Goins to "waive" a bonus for 2016.[59] For the foregoing reasons, Goins fails to plead a fraud claim and the motion to dismiss Count VI is **GRANTED**.

_____
Chancellor

---

[57] Am. Countercl. ¶ 183; *see also id.* ¶¶ 58 (quoting January 2015 email), 66 (referencing resending of January 2015 email).

[58] *See Edinburgh Hldgs.*, 2018 WL 2727542, at *12 (concluding that fraud was not adequately pled because "[w]hether those revenues would, in fact, be achieved was not *knowable* at the time [the Defendants] made the representations"); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006) ("They are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies. Such opinions and predictions are generally not actionable under Delaware law.").

[59] *See Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725, 811-12 (Del. Ch. 2014) (finding "that it would be unreasonable to infer that Philips N.V. issued its press releases . . . with an intent to induce Vichi . . . to make loans to LPD" over a year after the press releases were issued).

19