# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

WYPIE INVESTMENTS, LLC, a
Delaware limited liability company,

        Plaintiff,

    v.

WAYNE HOMSCHEK, individually,
PIE FACE HOLDINGS PTY
LIMITED, an Australian company,
and PIE FACE HOLDINGS, INC. a
Delaware corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N14C-08-140 WCC CCLD

Submitted: March 22, 2018
Decided: March 28, 2018

**Defendants Wayne Homschek and Pie Face Holdings PTY Limited's Motion
to Dismiss – GRANTED in Part and DENIED in Part**

## MEMORANDUM OPINION

Joel Friedlander, Esquire, Christopher M. Foulds, Esquire, Friedlander & Gorris, P.A., 1201 N. Market Street, Suite 2200, Wilmington, DE. Jennifer G. Altman, Esquire, Pilsbury Winthrop Shaw Pittman LLP, 333 SE 2nd Avenue, Suite 2000 Miami, FL. Attorneys for Plaintiff.

Wayne Homschek, 400 Chambers Street, Apt. 8D, New York, NY 10282. *Pro Se* Defendant.

**CARPENTER, J.**

Before the Court is a Motion to Dismiss Plaintiff WyPie Investments, LLC's ("Plaintiff" or "WyPie") Second Amended Complaint filed on behalf of Defendants Wayne Homschek ("Mr. Homschek") and Pie Face Holdings PTY Limited ("Global") (collectively, "Homschek Defendants" or "Defendants"). The remaining Defendant Pie Face Holdings, Inc. ("PF USA"), did not participate in the Homschek Defendants' Motion to Dismiss. On September 7, 2016, this Court granted a Motion to Withdraw as Counsel filed by then-counsel for the Homschek Defendants.[1] Over a significant time period, this Court has granted a number of extensions in order to allow the Homschek Defendants to retain new counsel. To date, no defense counsel has entered an appearance. Because, under Delaware law, artificial entities must be represented by counsel, this Court granted Plaintiff's Motion for Default Judgment as to Global's liability pursuant to Superior Court Civil Rule 55(b)(2) on January 11, 2017.[2] Since that time, the Court was informed that Mr. Homschek and Plaintiff were making an effort to resolve this dispute without further litigation and delayed deciding this motion. Given the Homschek Defendants' apparently unfortunate

---

[1] The Court also acknowledges that counsel for Defendant PF USA, like Global, was permit to withdraw on June 1, 2016, and since then PF USA has not retained new counsel, nor has the Plaintiff filed default judgment against this entity.

[2] *WyPie v. Homschek*, Del. Super., ID No. 60055865, Carpenter, W. (Jan. 11, 2017) (ORDER) ("All of the factual allegations against Global in WyPie's Second Amended Complaint shall be accepted as true.... WyPie has judgment against Global in an amount to be determined by the Court at...some later date."). *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 2006 WL 903578, at *2 n.4 (Del. Ch. April 3, 2006) ("In Delaware, artificial entities must be represented by counsel.").

2

economic circumstances, the Court encouraged the parties' continued attempt at settling the matter. Unfortunately, while there is a disagreement among the parties as to the status of the negotiation, it now appears to the Court the attempts to resolve the dispute have been unsuccessful and the parties have hit an impasse. As such, this is the Court's decision on the pending Motion to Dismiss Plaintiff's Second Amended Complaint.

## I. BACKGROUND

### A. *Pie Face*

This commercial dispute arises out of the failed expansion of Australian café chain, Pie Face, into the U.S. fast food market. Pie Face specializes in savory pies, espresso, coffee, and baked goods.[3] Mr. Homschek and his wife co-founded the brand in 2003 and formed Global under the laws of Australia to operate the business.[4] The couple was actively involved in managing Global, with Mr. Homschek serving as the company's CEO, and both he and his wife assuming positions on Global's Board of Directors.[5]

Global operated Pie Face branded stores across Australia according to a "hub and spoke" model.[6] Pursuant to this framework, most food products were

---

[3] Second Am. Compl. ("SAC") ¶ 15.
[4] *Id.* ¶¶ 13, 15–16. "Homschek, upon information and belief, was at all times material hereto a resident of New York City, New York, and was previously a resident of Australia." *Id.* ¶ 12.
[5] *Id.* ¶¶ 12, 17. Mr. Homschek's wife, Betty Fong, was Global's Chief Operating Officer.
[6] *Id.* ¶¶ 15–16.

manufactured and stored at Central Kitchen Facilities ("CKF"), the "hubs," and then distributed exclusively to Pie Face retail stores, the "spokes."[7] With approximately 70 company-owned and franchised stores across Australia, Global sought to expand the Pie Face brand internationally.[8]

On April 27, 2011, Global formed co-Defendant Pie Face Holdings, Inc. ("PF USA").[9] PF USA is a Delaware corporation and Global's wholly-owned subsidiary.[10] The early stages of PF USA's development and operations were financed with loans from Global, which would "be principally repaid through the issuance of 1,447 shares of PF USA common stock to Global."[11] A number of Global executives would be relocated to the United States to develop and manage PF USA, including Mr. Homschek, who would serve as PF USA's CEO and as Chairman of the company's Board of Directors.[12]

PF USA's business model "focused initially on developing and operating Pie Face stores throughout New York City" pursuant to the "hub and spoke" strategy.[13] As of June 2012, PF USA had developed a CKF in Brooklyn and one retail store in

---

[7] Id. ¶ 16.
[8] Id. ¶¶ 3, 17.
[9] Together Wayne Homschek, Pie Face Holdings PTY Limited, and Pie Face Holdings, Inc. are the Defendants.
[10] SAC ¶ 17.
[11] Id. ¶ 21.
[12] Id. ¶ 17.
[13] Id. ¶ 19.

Manhattan.[14] The Company also signed leases for three additional stores and made offers on five other potential locations.[15]

## B. The First Investment

As additional capital was needed by PF USA,[16] the Defendants sponsored and promoted a private placement of shares of the common stock of PF USA pursuant to a Private Placement Memorandum ("PPM") and Subscription Agreement (collectively, "Offering Documents").[17] The documents were prepared by Global's CFO at Mr. Homschek's direction.[18]

Sometime in early 2012, Mr. Homschek was introduced to Steven Wynn ("Mr. Wynn").[19] After learning about and tasting the product, Mr. Wynn expressed an interest in investing in PF USA.[20] After reviewing the Offering Documents, the parties executed a First Subscription Agreement ("FSA") and a Shareholders' Agreement ("SHA"), both of which are dated June 8, 2012.[21] Ultimately, based on the representations contained in these documents, Mr. Wynn agreed to invest $15

---

[14] *Id.*

[15] *Id.* ¶ 20.

[16] SAC ¶¶ 1, 22.

[17] *Id.*

[18] *Id.* ¶¶ 4, 22–23 (identifying Global's CFO as Robert Dardano, CPA).

[19] *Id.* ¶¶ 1, 22 (noting that the pair were introduced by a "mutual acquaintance"). The Complaint alleges Mr. Homschek set out to raise capital for PF USA, acting "individually and as an officer and director of both Global and PF USA." *Id.* ¶ 22. Steven Wynn is a real estate businessman known for his involvement in the casino and hotel industry.

[20] *Id.* ¶¶ 1, 8.

[21] SAC ¶¶ 22–23, Ex. A [hereinafter PPM], Ex. B [hereinafter FSA], and Ex. C [hereinafter SHA].

million in PF USA through his investment vehicle, WyPie (the Plaintiff in this matter), in exchange for 1,200 shares of PF USA common stock valued at $12,500 per share.[22]

In "evaluating the suitability of [the] investment," Plaintiff was prevented, per § 3.1(c) of the FSA, from relying on any external representations or information, "other than the PPM."[23] In addition to communicating the details of the offering, the PPM provided information for prospective investors relating to the Company's background, business model, governance, use of proceeds, capitalization, etc.[24] The PPM also contained financial projections for 2012 and 2013, including revenue estimates, from which costs were deducted to arrive at earnings before interest, taxes, depreciation and amortization ("EBITDA").[25]

By executing the FSA, Mr. Wynn affirmed, on behalf of WyPie, that he reviewed the Offering Documents and understood that all assumptions and projections were "for purposes of illustration only."[26] He affirmed that no

---

[22] Id. ¶¶ 2, 19–21, 30. The initial investment was made through Wynn Family Limited Partnership ("WFLP"). Id. ¶¶ 2 n.1, 11. WyPie is a Delaware Limited Liability Company created specifically for Wynn's personal investment in PF USA. Id. "On December 23, 2013, [WFLP] assigned its shares in PF USA to its wholly owned subsidiary, WyPie. At that time, WyPie invested an additional $5,000,000 in PF USA." Id. ¶ 11. For simplicity, WFLP and WyPie are referred to collectively as "WyPie."

[23] FSA § 3.1(c).

[24] PPM at i (table of contents).

[25] Id. at A-2.

[26] FSA § 5(d) (and warning "no assurance [was] given that actual results [would] correspond" with the PPM's illustrations).

representations had been made "as to the Company's future performance,"[27] and acknowledged that he was counseled by legal, financial, and tax professionals in connection with the June 2012 investment; and that counsel reviewed and negotiated the PPM and FSA.[28] Per § 6.7, the FSA and the SHA, discussed further *infra*, these documents constituted "the entire agreement of the parties...with respect to the [First Investment]" and superseded "any and all prior or contemporaneous" representations or agreements.[29]

## C. *The Shareholders' Agreement*

Simultaneous with the execution of the FSA, the SHA was entered "by and among" PF USA and its shareholders: Plaintiff, Global, Mr. Homschek, and Chris Sieger.[30] The SHA proclaimed to represent the parties' understanding "with respect to their relationship in their capacity as shareholders of the Company, and the governance and management of the Company."[31] In pertinent part, the SHA provides that the shareholders agreed with one another to "exercise all voting rights and powers of control available...in relation to the Company so as to give full effect to the [SHA's] terms and conditions."[32] Additionally, the agreement reflected that PF

---

[27] *Id.* § 3.1(c).
[28] *Id.* § 3.1(e).
[29] *Id.* § 6.7.
[30] SHA at 25, Schedule 1. Mr. Homschek signed on behalf of PF USA, as "President," and Global, as CEO. *Id.* at 25. The signature page designates Plaintiff as "INVESTOR." *Id.*
[31] *Id.* at 1.
[32] *Id.* § 8.2.

7

USA would be managed by a six-member Board of Directors, that two of those members would be appointed by Plaintiff,[33] and that Mr. Homschek would serve as the Board's Chairman.[34] As Chairman, Mr. Homschek would be required to "act impartially and pay regard to the interests of the Company."[35]

Of particular relevance to this litigation are the provisions of the SHA governing PF USA's financial information. Per § 10.2, PF USA would "reasonably permit" all shareholders and directors to inspect the assets of the Company and any documents relating to its business and accounts and to "discuss the Company's affairs, finances, and accounts with the Company's officers and auditor (if any)."[36] PF USA would be required to maintain "full, accurate and proper books of account and other records relating to [its] transactions, Business, and affairs."[37] The SHA also mandated that the Company prepare and distribute: (1) "full and accurate" management reports with profit and loss statements, balance sheets, and cash flow statements to the Board on a quarterly basis;[38] and (2) "a complete set of…financial accounts" with "a profit and loss statement, cash flow statement, and balance sheet"

---

[33] *Id.* §§ 5.1, 5.2. The Board was comprised of Homschek, Ms. Fong, Mr. Sieger, and Alun Evans. *Id.* § 5.1. Pursuant to § 5.2, Plaintiff appointed Andrea Wynn, who was later replaced by Steven Dezli and Kevin McCollum. *See* SAC, Ex. I [hereinafter SSA] at Ex. 1.
[34] SHA § 6.1.
[35] *Id.*
[36] *Id.* § 10.2 (a) – (c).
[37] SAC ¶ 24; SHA § 13.1.
[38] SHA § 13.2. *See also* SAC ¶ 25 (alleging that "WyPie had to beg, plead and cajole Defendants for financial data and, when such data was received, it was typically incomplete and, as detailed below, rife with material misrepresentations regarding the affairs of PF USA").

to shareholders annually.[39] Importantly, the SHA stated that the Company's profit and loss statements and balance sheets would be prepared "in accordance with [GAAP] and standards consistently applied."[40]

### D. The Second Investment

By 2013, PF USA was continuing to struggle to generate the cash required to sustain operations and, lacking sufficient reserve funds, Mr. Homschek turned again to Mr. Wynn for additional capital.[41] On December 23, 2013, WyPie invested an additional $5 million in exchange for 400 shares of PF USA common stock pursuant to a Second Subscription Agreement ("SSA").[42] The $5 million was contractually restricted, however, in that PF USA would be required to allocate $2.5 million of the proceeds "to fund[ing] continuing operations" and use the remainder for the "development of additional…stores."[43]

The SSA incorporated by reference the "unaudited balance sheet, income statement and statement of cash flows of the Company for the fiscal year ended June 30, 2013."[44] Once again, this financial information was allegedly prepared by Global's CFO under Mr. Homschek's supervision.[45] Section 2.7 of the SSA

---

[39] SHA § 13.3.
[40] *Id.* § 13.4.
[41] SAC ¶ 55.
[42] *Id.* ¶¶ 55, 63.
[43] *Id.* ¶ 63.
[44] *Id.* (quoting SSA § 2.7).
[45] *Id.* ¶¶ 56–57 ("Homschek directed that the financial accounting reporting function for PF USA be controlled by Global in Australia and not accessible to the other stockholders.").

represented and warranted that the financial information was "prepared in accordance with the books and records of the Company" and "present[ed] fairly, in all material respects, the financial condition of the Company at the respective dates hereof."[46] Like the FSA, the SSA contained an integration clause stating that it and the SHA constituted PF USA and Plaintiff's "entire agreement" with respect to the transaction.[47]

### E. The 2014 Audit

In January 2014, Plaintiff learned that Homschek Defendants had allegedly failed to comply with the SHA's provisions with respect to PF USA's financial information and "insisted an independent auditor be engaged."[48] It was ultimately revealed, on February 18, 2014, that Homschek Defendants had improperly capitalized expenses in excess of $5 million on PF USA's financial reports for all periods prior to 2014.[49]

According to Plaintiff, as a result:

---

[46] *Id.* ¶ 58.

[47] SSA § 6.7.

[48] SAC ¶ 64.

[49] *Id.* ¶¶ 64–65 ("WyPie insisted an independent auditor be engaged…."). According to Plaintiff, at the meeting "a draft audit report…was presented that included an approximate $5,000,000 audit adjustment. The audit adjustment highlighted, for the first time, that for all periods prior to 2014, Defendants improperly capitalized in excess of $5 million on PF USA's financial reports for store openings, equipment purchases and the like. Those items should have been expensed, not capitalized." *Id.* ¶ 65.

> [T]he financials were consequently subject to a 2013 audit adjustment whereby such amount was completely written down (causing total assets to decrease from approximately $20 million to $15 million…).[50]
>
> …
>
> This audit adjustment was a direct write-down to PF USA's retained earnings and never appeared as an expense on the books of PF USA. Moreover, Defendants never caused the preparation or presentation by PF USA of restated financial statements for the applicable covered periods showing the effect of expensing the $5,000,000, which allowed this amount to remain undetected. [51]

In other words, the audit revealed that "the financial statements attached to the [SSA] overstated assets by approximately $5,000,000 (or 45%) and understated the Company's 2013 losses by $1.2 million (or 37%)."[52]

As a result of this discovery, Mr. Homschek, Global, and WyPie, among others, on June 25, 2014 "entered into an agreement…permitting WyPie to elect a majority of the Board and eliminated all of the supermajority voting requirements with respect to Board and shareholder matters for PF USA."[53] Since that time, Plaintiff has exercised majority control of the Company.[54]

On July 9, 2014, the Board voted to return $2,025,000 of Plaintiff's $5,000,000 investment because, as PF USA no longer intended to develop additional stores, and the SSA's directive as to the use of those proceeds would not be

---

[50] *Id.* ¶ 65.
[51] *Id.* ¶ 66.
[52] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 8–9 (citing SAC ¶¶ 59, 62-67).
[53] SAC ¶ 68.
[54] *Id.* ¶ 11.

fulfilled.[55] "The Board acknowledged that at the time of WyPie's investment on December 23, 2013, the value of 100% of PF USA was determined to be no more than $2,500,000 by an independent appraiser."[56] At present, WyPie owns 50.03% of PF USA's issued and outstanding stock and "[t]he bulk of the remaining outstanding shares are owned by Global, with smaller amounts owned by Mr. Homschek and others individually."[57]

## F. The Instant Litigation

PF USA was allegedly "shuttered" as a result of Defendants' conduct, leaving WyPie "with a 50.03% equity holding worth virtually nothing."[58] As a result, WyPie commenced the instant litigation on August 22, 2014.[59] The Second Amended Complaint ("Complaint"), filed December 2, 2015, asserts claims for fraudulent inducement, fraud, negligent misrepresentation, and breach of contract against PF USA, Global, and Mr. Homschek, individually. It also contains a tortious interference claim against the Homschek Defendants. As mentioned in the introduction to this Opinion, this Court granted Plaintiff's Motion for Default

---

[55] *Id.* ¶ 69.
[56] *Id.*
[57] *Id.* ¶ 70.
[58] *Id.* ¶ 72.
[59] Plaintiff originally sought to pursue claims of fraudulent inducement, rescission, negligent misrepresentation, and unjust enrichment. Plaintiff then amended the Complaint to add claims for fraud and conversion ("First Amended Complaint"). Defendants filed a Motion to Dismiss the First Amended Complaint and following a hearing on October 19, 2015, the Court reserved decision. Plaintiff then filed the current version of the Complaint.

Judgment against Global in January 2017.[60]  Prior counsel for the Homschek Defendants filed the instant Motion to Dismiss which was held in abeyance until it was clear new counsel was not entering the case and settlement negotiations had been unsuccessful.

## II.  STANDARD OF REVIEW

Pursuant to Delaware Superior Court Civil Rule 12(b)(6), the Court will dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted."[61] Dismissal is limited to those cases in which the Court determines "with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[62]  In deciding the Homschek Defendants' motion, the Court must assume as true the well-pleaded allegations of the Complaint,[63] and afford Plaintiff "the benefit of all reasonable inferences that can be drawn from [their] pleading."[64]  While the Court must generally decline

---

[60] Since the Motion to Dismiss was filed before the default judgment was entered against Global, to avoid confusion the Court will continue to use "Homschek Defendants" referenced in the briefings, even though the decisions will have limited applicability to Global. It may also provide guidance as to the damages that should be found against Global. However, to any extent the Motion is granted as to Homschek Defendants, such ruling only applies to Mr. Homschek and the default judgment against Pie Face Holding PTY Limited would take priority.

[61] Super. Ct. Civ. R. 12(b)(6).

[62] *See Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *3 (Del. Super. Ct. April 16, 2014) (citing *Clinton v. Enterprise Rent–A–Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[63] *See Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38–39 (Del. 1996). *See also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003); *Precision Air v. Standard Chlorine of Del.*, 654 A.2d 403, 406 (Del. 1995) (explaining that complaint is "well-plead" so long as it puts the opposing party on notice of the claim brought against it).

[64] *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991).

13

review of matters outside the complaint, documents that are integral to or incorporated by reference in the complaint may be considered.[65] "[A] complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations."[66]

## III. DISCUSSION

### A. Fraud

The Homschek Defendants have moved to dismiss the fraud allegations found in Counts I and II of the Complaint. To state a claim for fraud, a plaintiff must plead facts supporting an inference that:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[67]

Under Superior Court Civil Rule 9(b), a plaintiff must plead fraud with particularity.[68] "The purpose of [Rule 9(b)] is to apprise the adversary of the acts or

---

[65] *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995).
[66] *See H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del.Ch. 2003)).
[67] *See Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).
[68] Super. Ct. Civ. R. 9(b).

omissions by which it is alleged that a duty has been violated."[69] To plead fraud with the particularity required by Rule 9(b), a plaintiff must include the "time, place, contents of the alleged fraud, as well as the individual accused of committing the fraud".[70]

The first two Counts of the Complaint, though styled as two separate claims, Count I fraud in the inducement and Count II fraud, both assert that all Defendants, Mr. Homschek, Global, and PF USA, "knowingly, or with reckless regard for the truth, made repeated materially false and misleading statements regarding PF USA."[71] But for those representations, Plaintiff maintains it would not have entered the FSA, SHA, or SSA and Defendants' fraud has since caused WyPie damages including the loss of its investment in PF USA.[72]

The fraud alleged regarding the initial June 2012 investment is based on representations contained in the FSA and the PPM.[73] Consistent with the provisions of the FSA, Plaintiff was entitled to rely on the PPM in evaluating its initial

---

[69] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. Ct. 1971).

[70] *See TrueBlue, Inc., v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Ct. Sept. 25, 2015) (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Ct. Feb. 1, 2012)).

[71] SAC ¶¶ 81, 89 (including "providing financial reports that substantially and materially overstated income for monthly, quarterly and annual periods ending on or before November 30, 2013," and "providing financial and operational forecasts wherein financial projections and performance were substantially and materially misstated").

[72] *Id.* ¶¶ 84, 91.

[73] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 6, 8.

15

investment in PF USA.[74] Plaintiff claims the PPM, as prepared by Global and Mr. Homschek, materially misrepresented: (1) PF USA's projected financial performance; (2) the CKF's capacity to supply 30-40 stores; (3) how investment proceeds would be used; and (4) Global's status as "an established leader" with "strong store economics" and a "proven track record."[75] According to Plaintiff, the false representations were made knowingly and with the sole intention of inducing WyPie's $15 million investment.[76]

As for the Second Investment, Plaintiff alleges financial statements for the period ending June 30, 2013, as prepared by Global under Mr. Homschek's supervision and incorporated in the SSA, intentionally overstated PF USA's assets by $5 million and understated losses by $1.2 million.[77] This discrepancy was allegedly achieved by Homschek Defendants' improper capitalization of certain costs. In § 2.7 of the SSA, PF USA represented to WyPie that the incorporated statements "present[ed] fairly, in all material respects, the financial condition of the Company."[78] The SSA's integration clause defined the "Entire Agreement" to include the terms of the SHA, under which the Company's balance sheets were required to conform with GAAP. Thus, Plaintiff claims it reasonably relied on the

---

[74] SAC ¶ 30 (citing FSA § 3.1(c)).
[75] *Id.* ¶¶ 38-39.
[76] *Id.* ¶¶ 78, 87.
[77] *Id.* ¶¶ 57–59, 62.
[78] *Id.*; SSA § 2.7.

16

financial information attached to the SSA and that, had it known the Company's true financial condition, it would not have invested the additional $5 million.[79]

The Homschek Defendants move to dismiss Plaintiff's fraud counts on the grounds that WyPie has failed to identify any "false facts" in the underlying documents that support an inference of fraud. Rather, the alleged representations amount to puffery or forward looking statements, neither of which are actionable as fraud. Further, Homschek Defendants contend Plaintiff's fraud claim must fail in light of various buyer representation and disclaimer provisions appearing throughout the transaction documents.[80]

While the Court finds Mr. Homschek's conduct to be outrageous, in the context of the contractual provisions relied upon by Plaintiff, it must agree with the Homschek Defendants. The Complaint largely fails to allege justifiable reliance on any false statement of material fact insofar as the First Investment is concerned. First, "a company's optimistic statements praising its own 'skills, experience, and

---

[79] SAC ¶¶ 57–59, 67.

[80] The Homschek Defendants also appear to argue that, as Global and Homschek are not parties to the PPM, FSA, or SSA, they cannot be liable for the misrepresentations allegedly contained therein. Defs.' Mot. to Dismiss at 36. At this stage, the Court will not dismiss the fraud claims on this basis. *See Anvil Holding Corp. v. Iron. Acq. Co.*, 2013 WL 2249655, at *6–7 (Del. Ch. May 17, 2013). The allegations of the Complaint, which the Court accepts as true, suffice at this juncture to tie the fraud claims to conduct engaged in by Mr. Homschek, both individually and on behalf of Global. *See Aviation West Charters, LLC v. Freer*, 2015 WL 5138285, at *5–6 (Del. Super. Ct. July 2, 2015).

resources' are 'mere puffery and cannot form the basis for a fraud claim.'"[81] Thus, the PPM's description of Global as "an established leader" with "strong store economics" and a "proven track record," even if misleading, does not amount to a false representation of material fact.[82] In fact, it appears the business model of the venture in Australia was quite successful. Nor could a sophisticated investor like Mr. Wynn, advised by an impressive team of legal and financial counsel, have reasonably relied on such "boasts and blandishments" about Global in the PPM in deciding to invest in PF USA.[83]

The PPM's representations concerning the expected capacity of the CKF and projected financial results do not fare much better as they concern future events and/or statements of opinion.[84] Plaintiff claims that the PPM falsely represented that the CKF was "fully functional" and that the Company "expect[ed]" it to be "capable of supplying about 30-40 stores...without significant additional capital expenditures."[85] In addition, Plaintiff alleges that the PPM's financial projections

---

[81] *See Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *7–8 (Del. Ch. July 20, 2010) (quoting *Solow v. Aspect Res.*, LLC, 2004 WL 2694916, at *3 (Del. Ch. 2004)). "Puffery is a 'vague statement' boosting the appeal of a service or product that, because of its vagueness and unreliability, is immunized from regulation." *Id.* (quoting David A. Hoffman, *The Best Puffery Article Ever*, 91 Iowa L. Rev. 1395, 1397 (2006)).

[82] *See id.* (finding fraud claim based on statements about company's "very strong brand name," "established market presence," and "unprecedented levels of customer loyalty" "classically vague statements that a commercial party routinely makes during deal-making courtship" rather than false representations of material fact).

[83] *See id.* at *8. It is also worth noting that the PPM explicitly and repeatedly cautioned WyPie not to rely on *Global's* performance when evaluating its investment in *PF USA*. PPM 1–2, 12, & 16.

[84] *See Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001).

[85] PPM at 3, A-1.

improperly capitalized expense items and thereby artificially inflated the forecasted EBITDA.[86] Plaintiff argues "accounting rules" required the Homschek Defendants to deduct expenses from revenue in calculating the projected financials.

It is well settled in Delaware that "[p]redictions about the future cannot give rise to actionable common law fraud[,]…[n]or can expressions of opinion."[87] While Plaintiff alleges the CKF was incapable of supplying *"eight* stores" at the time the representation was made, it alleges elsewhere throughout the Complaint that "[p]rior to June 8, 2012, PF USA developed *only one* retail store…."[88] The language of the PPM likewise supports that, at the time the expectations for the CKFs had been represented to Mr. Wynn in the PPM, PF USA was only operating *one* retail store.[89] The representations in the PPM thus clearly related to the Company's *future* expectations for the CKF.[90]

---

[86] SAC ¶¶ 33–35; Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 6.

[87] *See Great Lakes Chem. Corp.*, 788 A.2d at 554. *See also Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. July 16, 2009) (citing *Esso Standard Oil Co. v. Cunningham*, 114 A.2d 380, 383 (Del. Ch. 1955) ("Opinions and statements as to probable future results are not generally fraudulent even though they related to material matters….")).

[88] SAC ¶ 19 (emphasis added).

[89] PPM at 25. *See also H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del.Ch. 2003) ("[A] complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations."); *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *5 (Del. Ch. April 29, 2010) ("[A] court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences.") (internal quotation marks omitted).

[90] It is also worth noting that the PPM defines any statement addressing "projected…capital expenditures (including the amount and nature thereof)" as "forward looking statements" "subject to a variety of risk that could cause actual results to differ materially from those projected…." PPM at vi.

In an attempt to characterize the allegedly misleading projections as misrepresentations of existing fact, Plaintiff cites the PPM's representation that PF USA "believed" it had a "reasonable basis" in making the projections.[91] This argument is unavailing. The statement concerning the Company's "belief" is nothing more than an "expression of opinion that the projections were adequately supported" and thus, does not amount to actionable fraud.[92]

Even assuming the PPM's financial projections and statements concerning the CKF could be deemed actionable misrepresentations, it is clear Plaintiff would not have been justified in relying on the representations. The Court recognizes that § 3.1(c) of the FSA permitted Plaintiff to rely on the PPM in making its investment decision.[93] However, such reliance must also be said to have been "reasonable" in order to sustain a claim for fraud. The language of the FSA and PPM quite clearly

---

[91] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 6, 11–12 (quoting PPM at A-1 and citing Financial Accounting Standards Board Codification 720-15-25 and Australian Accounting Standards Board 138-69 (2015)). According to Plaintiff:

> This was not an accident, as Defendants did the same thing at Global. According to Jirsch Sutherland, the Administrator appointed in connection with Global's Australian bankruptcy proceeding (which not surprisingly occurred just after WyPie filed this lawsuit in the Fall of 2014 shortly after discovering Defendants' fraudulent conduct), Global's "[f]inancial assets . . . includ[ing] Franchise development costs, store opening costs" were "amorti[z]ed on a systematic basis matched to the future economic benefits over the useful life of the project."

SAC ¶ 35 (quoting Administrator's Report to Creditors, at 13 (Dec. 18, 2014) (attached as Exhibit K)).

[92] *See Great Lakes Chem. Corp.* v. *Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (finding Company's statement that its "current financial posture justified the projections" amounted to an expression of opinion, not fraud).

[93] FSA § 3.1(c).

eliminate "forward looking statements," such as the financial and operational projections, from the purview of information upon which Plaintiff could have "reasonably relied" in deciding whether to invest in PF USA.[94]

The PPM conspicuously cautioned that any investment in PF USA would entail "a high degree of risk," that all estimates and projections were "highly speculative" and subject to "significant uncertainties and contingencies," and that "[no representation is made... that [PF USA] can or will attain such [projected] results.]"[95] To the contrary, the PPM stated "[actual results are likely to vary, perhaps materially, from the projections.]"[96]

In the FSA, Plaintiff represented that it reviewed and understood these and other risks associated with the investment.[97] Section 5.1(d) of the FSA further reflects Plaintiff's understanding that any assumptions and/or projections in the PPM were "for purposes of illustration only" and that the Company made "no assurance...that actual results [would] correspond" with those forecasted.[98] Indeed,

---

[94] *See generally H-M Wexford LLC*, 832 A.2d at 142–43 ("Even if the [Private Placement Memorandum provided to Wexford] [] were[sic] considered for purposes of the misrepresentation claims, the financial information and projections section of the PPM contains an explicit disclaimer regarding the projections printed in bold type, stating that the projections had not been reviewed and no assurances were given with regard to the projections, and, furthermore, the projections should be read in conjunction with the enumerated risk factors and schedules discussing the projections attached thereto.").

[95] Defs.' Mot. to Dismiss at 21 (emphasis in original) (quoting PMM at ii-iii, 8).

[96] *Id.* (emphasis in original).

[97] FSA § 4.

[98] *Id.* § 5(d).

Plaintiff concedes it expressly represented that it invested fully aware that PF USA made "no representations to the Company's future performance."[99] In addition, Plaintiff represented in the FSA that it was investing in PF USA despite likely inaccuracies in the Company's financial forecast due to "limited operating history" and despite the risk that expense projections could be "materially underestimated."[100] The PPM specifically forewarned that the "financial projections and information set forth...[there]in were *not prepared*...[in] compliance with [GAAP] and have not been examined, reviewed or complied by independent public accountants."[101]

Mr. Wynn is a knowledgeable and experienced investor who entered the FSA based on information he understood to be speculative and incomplete, and fully aware that an investment by WyPie in PF USA would be a risky one.[102] Yet, by signing the FSA, WyPie represented that the decision to invest was guided by a team of legal and financial professionals who reviewed and negotiated both the PPM and FSA.[103] Plaintiff represented it and its advisors had the opportunity "to evaluate the merits and risks of [the] investment," to obtain additional information from the Company, and "to verify the accuracy of the information provided...by the

---

[99] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 22 (citing FSA § 3.1(c)).
[100] FSA § 3.1(d) – (e) (attributing forecasting difficulties to the "limited" history upon which costs could be estimated).
[101] PPM at A-1 (emphasis added).
[102] FSA § 3.1 (c) – (g).
[103] *Id.* § 3.1(e).

Company."[104] Given the nature of the alleged representations and the clear language of the PPM and FSA, Plaintiff cannot now claim fraud based on the PPM's financial projections or expectations for the CKF.

Plaintiff also alleges the PPM misrepresented the use of net proceeds and concealed that PF USA was paying for Mr. Homschek's lavish personal expenses.[105] According to PPM, investment proceeds would "generally" be used "for working capital and growth purposes in the *discretion of the Board*."[106] While the PPM indicated that Mr. Homschek would earn a salary of $150,000, it did not disclose that PF USA would use investment proceeds to make rental payments of up to $19,000/month for Mr. Homschek's Manhattan apartment in addition to allocating thousands of dollars toward his children's private education.[107] Plaintiff claims that, had these costs been accounted for, the "Corporate Costs" projected in the PPM would have increased dramatically.[108] Plaintiff claims the Homschek Defendants knew the figure was false at the time it was communicated to Mr. Wynn, because Mr. Homschek was "foisting these personal expenses on the Company."[109]

---

[104] *Id.* § 3.1 (e) – (h).h
[105] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 13.
[106] SAC ¶ 46 (quoting PPM at 33 (emphasis added)).
[107] *Id.* ¶¶ 46–48. PF USA allegedly first paid $14,500/month for the apartment which was at some later unspecified date "upgraded" to $19,000/month. *Id.*
[108] *Id.* ¶¶ 49–51.
[109] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 14; SAC ¶ 48 (claiming Defendants foisted all of these costs on the Company and intentionally concealed that fact from Mr. Wynn "because no one…would have invested in a start-up company knowing…[it] was …paying $300,000 a year for the CEO's apartment and children's school, particularly where, as here, that

Homschek Defendants contend Plaintiff cannot sustain a claim of fraud based on the alleged omissions relating to Mr. Homschek because the PPM expressly disclosed that PF USA intended to:

> (i) use the investment proceeds to pay back Global's loans to PF USA in excess of $3 million outstanding , (ii) reimburse Global for out of pocket expenses and pro rata time of Global executives and employees spent working on and developing PF USA, and (iii) leverage the members of Global's senior management team, which included both...Homschek and [his wife], in connection with the start-up phase of PF USA.[110]

Thus, according to the Homschek Defendants, WyPie was "clearly on notice" of the payment arrangement. Additionally, the Motion asserts that "[i]n the context of Wynn's $15-million initial investment," the costs relating to Mr. Homschek were relatively minimal and "immaterial" to Plaintiff's evaluation of the First Investment.[111]

While the Court finds the payments made to Mr. Homschek for personal expenses to be distasteful, the PPM does provide that the initial investment by WyPie was to be utilized at the discretion of the Board and would cover executive expenses. Unfortunately for WyPie, they did not take steps to protect this investment from expenses they would consider inappropriate but instead left that decision to the

CEO was paid $600,000 between Global and PF USA and also received stock without any capital investment...").

[110] Defs.' Reply Br. at 11–12; Defs.' Mot. to Dismiss at 30 (citing PPM at 7, 28, 30, & 33–35).

[111] Defs.' Reply Br. at 12–13.

Board of which Mr. Homschek exercised significant control. Had Plaintiff desired more control over how the proceeds of its initial investment would be used, it would seem prudent and reasonable to have included a contractual restriction to that effect. That said, it does appear the expenses of the nature complained about by Plaintiff needed Board approval before investment funds could be used for them. It is unclear to the Court the extent the Board was aware of these expenses and approved them or whether they were concealed and were directed to Mr. Homschek's personal use without their knowledge. It is also reasonable that WyPie was relying upon the Board to exercise reasonable oversight of such expenses. As a result, at the moment the Court will allow discovery on this issue and will not grant dismissal based on allegations in the Complaint. If it appears after discovery that Mr. Homschek's diversion of the investment for personal use was done with the full knowledge and approval of the Board, the fraud claim would not go forward.

Nor will the Court dismiss Plaintiff's claim for fraud in connection with the Second Investment. Plaintiff alleges the SSA incorporated fraudulent financial statements which were allegedly prepared by Global's CFO under Mr. Homschek's direction.[112] According to Plaintiff, the Homschek Defendants knew PF USA was not generating sufficient cash flow and manipulated the financials so as to conceal the true state of the Company's affairs. Plaintiff maintains that it would not have

---

[112] SAC ¶¶ 57–58.

contributed the additional $5 million had it known PF USA's true financial condition.[113] Despite these allegations, Homschek Defendants move to dismiss the claim, contending (1) Plaintiff disclaimed reliance on the financial statements, and (2) the statements are not false or misleading.

First, the Court cannot find Plaintiff "disclaimed reliance" on the June 2013 financial statements. Rather, as Plaintiff points out, it appears WyPie was contractually entitled to rely on the financials at issue because they are incorporated in and attached to the SSA.[114] Further, the contract's integration clause provides that the "Entire Agreement" consisted of the SSA and the SHA. Among the SSA's provisions is a representation by the Company that "to its actual knowledge" (which § 2.19 defines as the actual knowledge of Mr. Homschek, among others), there had been no breaches of the SHA by any party thereto and that all parties were in compliance with their obligations as of the SSA's execution date.[115] Given the language of the SSA and § 13 of the SHA, Plaintiff could have reasonably relied on the financial statements incorporated in the SSA as fairly depicting the Company's financial condition and calculated in accordance with GAAP.

---

[113] *Id.* ¶¶ 57–59, 67.

[114] SSA §§ 2.7, 6.10. The Court notes that § 2.7 is one of *nineteen* representations and warranties made by PF USA in the SSA. This stands in stark contrast to the FSA, where the Company made but *two* representations and warranties, all of which related to PF USA's organization, corporate power, and authority to issue stock.

[115] *Id.* § 2.16

The second ground Homschek Defendants advance for dismissal is that Plaintiff failed to plead that the SSA's financial information was "misleading."[116] "An essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented."[117] The Court acknowledges, and Plaintiff does not seem to dispute, that the unaudited 2013 financials list "US Development Costs," "Pre-Opening Costs," "US Marketing Costs," etc. as assets.[118] It is also clear to the Court that Plaintiff, once again, represented it, and its *financial and legal counsel*, received, reviewed, and understood the SSA and any other information pertaining to the December 2013 investment.[119] Nevertheless, the Court is not inclined to dismiss Plaintiff's fraud claim as it relates to the SSA at this juncture. Plaintiff pleads that Mr. Homschek insisted "the financial accounting reporting function for PF USA be controlled by Global in Australia and *not accessible to the other stockholders.*"[120] It seems reasonable to infer, given these allegations, that Plaintiff demanded SSA § 2.7 as contractual assurance that the financial statements upon which it was relying fairly and accurately reflected the Company's financial condition. The Motion to Dismiss Counts I and II regarding the First Investment **and** the PPM financials and CFK predictions is **GRANTED**. However, the Homschek

---

[116] Defs.' Reply Br. at 13–14.
[117] *Debakey Corp. v. Raytheon Serv. Co.*, 2000 WL 1273317, at *25 (Del. Ch. Aug. 25, 2000).
[118] SSA at Tab 4D.
[119] *Id.* § 3.1(f).
[120] *Id.* (emphasis added).

27

Defendants' Motion to Dismiss Counts I and II regarding the First Investment **and** any omissions or representations about the personal use of the funds is **DENIED**. Similarly, Homschek Defendants' Motion to Dismiss regarding the Second Investment is **DENIED**.

### B. Breach of Contract

In the Complaint, Plaintiff alleges the Homschek Defendants have breached the SHA, FSA, and the SSA in an effort to induce Plaintiff to invest in the PF USA. More specifically, Plaintiff argues the Defendants breached the FSA and SSA when Defendants provided inaccurate financial statements and did not use the proceeds in accordance with SSA listed uses. Plaintiff also asserts that the Homschek Defendants breached SHA by: (1) "failing to provide timely financial statements that were full, fair, accurate, and compliant with [GAAP]"[121] and (2) by using their "control over the financial reporting of PF USA to cause the generation and presentation of inaccurate financial statements."[122]

Homschek Defendants refute the Plaintiff's breach of contract claims, as Mr. Homschek was not a party to the SHA, FSA, or the SSA, nor was Global a party to either the FSA or SSA. Defendants argue Mr. Homschek and Global can face no personal liability because only Pie Face Holdings, Inc. signed the FSA and SSA.[123]

---

[121] *Id.* at §§ 13.1–13.4.
[122] SHA §§ 8.2, 6.1; SAC ¶¶ 94–96.
[123] Defs.' Mot. to Dismiss at 38.

Defendants further assert that the only agreement the Homschek Defendants could possibly be accused of breaching is the SHA.[124] However, Homschek Defendants urge the Court to dismiss the Plaintiff's breach of contract claim regarding the SHA because (1) Mr. Homschek is not a party to the SHA; (2) the obligations allegedly breached were those of PF USA, not Global or Mr. Homschek; and (3) Plaintiff failed to provide PF USA with notice and an opportunity to cure the alleged breaches as was required under the terms of the SHA.[125]

The Plaintiff fails to dispute in its Response to the Defendants' Motion to Dismiss that Homschek Defendants are not signatories to the FSA and SSA. Instead, Plaintiff's reply focuses solely on why the Homschek Defendants are both parties and signatories to the SHA. As a result, the Court finds that Plaintiff's Breach of Contract claims regarding the FSA and SSA have been conceded by Plaintiff and do not warrant further discussion.

However, the Court does find that both Mr. Homschek and Global are parties to the SHA. Mr. Homschek is a signatory to the SHA[126] and the SHA states that it was "entered into…by and among" PF USA and PF USA's shareholders as "listed on Schedule 1."[127] Schedule 1 expressly designates Mr. Homschek, in his individual

---

[124] *Id.* at 37–38.
[125] *Id.*
[126] *Id.* at 25.
[127] SHA at 1.

capacity, as a PF USA shareholder in addition to Plaintiff and Global.[128] Thus, the Court finds the Homschek Defendants, like the other shareholders, were bound by the terms of the SHA.[129]

To the extent Count III relates to the financial and accounting provisions outlined in § 13 of the SHA, it cannot proceed against the Homschek Defendants. These provisions expressly obligate "the Company" to take certain measures in maintaining, preparing, and distributing PF USA's financial information to its Board of Directors and shareholders.[130] Thus, Plaintiff is limited to seeking recourse for any of breach of §§ 13.1-13.4 from PF USA.

This logic does not extend, however, to the claims for breach of §§ 8.2 and 6.1 of the SHA. The Complaint identifies Global as PF USA's controlling shareholder at all times relevant to this litigation and Mr. Homschek as director, Chairman of the Board, and CEO of the Company.[131] Pursuant to § 8.2, "[e]ach Shareholder agree[d] with the others" to "exercise all voting rights and powers of control available to it in relation to the Company so as to give full effect to the terms and conditions" of the SHA.[132] Moreover, § 6.1 states that Mr. Homschek, as

---

[128] *Id.* at Sched. 1.
[129] *Id. See also id.* § 21.4 (providing that the SHA "binds and benefits the parties").
[130] SHA §§ 13.1–13.4.
[131] SAC ¶¶ 12–13.
[132] SHA § 8.2. The SH
A defines "control" as "the power to direct the management and policies of a person, directly or indirectly, by or through stock ownership, agency or otherwise...." § *Id.* 1.1.

Chairman of the Board, "must act impartially and [to] pay regard to the interests of the Company."[133] These provisions clearly imposed obligations upon the Homschek Defendants.[134]

Even still, Homschek Defendants respond that Plaintiff's claim for breach of the SHA is barred due to Plaintiff's failure to comply with § 17.1(a) of the agreement.[135] This section defines "Events of Default" under the SHA and includes "the failure of a party to do, execute or perform any material deed, matter, act or thing which that party is obliged to do, execute or perform under this Agreement that remains unremedied for…10 Business Days after notice has been delivered by the Company or another Shareholder of that breach."[136] "Notice" given under the SHA must be, among other things, signed and "in writing."[137] Plaintiff does not dispute that such notice was never provided.

Delaware Courts "often enforce pre-suit notice provisions."[138] Where a contract's terms "clearly evidence an intent that litigation be pursued only after

---

[133] *Id.* § 6.1. Per PF USA's Bylaws, among the Chairman's powers was "determin[ing] the compensation and duties of all officers, employees and agents of the Corporation." SAC, Ex. J at Art. V, § 6.

[134] According to Plaintiff, Wynn demanded these contractual protections because it was not intended that he would be directly involved with the business "beyond attending periodic Board meetings and receiving certain financial information." SAC ¶ 28.

[135] Defs.' Mot. to Dismiss at 38.

[136] SHA § 17.1(a).

[137] *Id.* § 19.1(b) – (c).

[138] *See U.S. Bank Nat. Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,* 2004 WL 1699057, at *3 n.24 (Del. Ch. July 29, 2004) (citing *Harper v. Del. Valley Broadcasters,* 743 F. Supp. 1076 (D. Del. 1990), *aff'd,* 932 F.2d 959 (3d Cir.1991); *Medspan Shipping Servs., Ltd. v. Prudential Lines,* 541 F. Supp. 1076, 1079 (E.D.Pa. 1982); *Int'l Bus. Machines Corp. v. Comdisco, Inc.,* 1991 WL

notice and an opportunity to cure," a party must generally comply with prescribed notice and cure procedures in order to pursue a claim of breach under the agreement.[139] The mere filing of a complaint is insufficient to "afford the receiving party an opportunity to cure its defaults in a non-litigious manner."[140] Defendants argue that the only reasonable interpretation of § 17.1(a) is that no party to the SHA can sue for breach of that contract without first providing notice and an opportunity to cure.[141]

Plaintiff counters that the SHA cannot be read as requiring notice as a condition precedent to its ability to file suit.[142] In support of this position, Plaintiff correctly points out that, unlike in the cases relied upon by Defendants, the SHA lacks any language connecting the events of default defined in § 17.1 with its authority to sue for breach of the agreement.[143] In particular, Defendants cite *U.S. Bank National Ass'n v. U.S. Timberlands Klamath Falls, LLC* and *Cornell Glasgow, LLC v. LaGrange Properties, LLC*. In *U.S. Bank National Association*, the Court of Chancery found the parties to have contracted to a pre-suit notice provision where their agreement clearly defined an "Event of Default" and, "of particular relevance,"

---

269965, at *9 (Del. Super. Ct. Dec. 4, 1991) (citing *Harper* and *Medspan* with approval for proposition that filing of complaint is inadequate notice because there is no ability to cure in a non-litigious manner)).

[139] *See id.*

[140] *See id.* (quoting *Medspan Shipping Servs.*, 541 F. Supp. at 1079).

[141] Defs.' Reply Br. at 15.

[142] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 32.

[143] *Id.* at 33.

included a provision specifically tying the trustee's power to sue to the occurrence of an Event of Default.[144] Further, in *Cornell Glasgow*, the Delaware Superior Court found, following trial, that the contract at issue "oblig[ated]" the parties "to provide...notice of default and opportunity to cure before pursuing remedies for breach in court."[145]

The parties have not identified any other provision in the SHA referencing § 17.1 or the term "Event of Default." Nor has either party pointed to language in the contract "prescribing the consequences of failing to follow the[]...[notice] procedure[]."[146] At the motion to dismiss stage, the Court cannot conclude the SHA

---

[144] *See U.S. Bank Nat. Ass'n*, 2004 WL 1699057, at *3. "The Chancery Court, upon "[r]eading the[] provisions [of the contract] together," determined it was "clear that if there is no failure to make a required payment, the Indenture makes the Trustee's authority to sue dependent upon the giving of notice of a default and passage of the 60-day cure period." Id. The Court's discussion of these provisions is as follows:

Of particular relevance, section 6.3 of the Indenture grants the trustee the authority to sue the Issuer but ties that power to the occurrence of an Event of Default, as follows:

> *If an Event of Default occurs and is continuing,* the Trustee may pursue any available remedy (under this Indenture or otherwise) to collect the payment of principal or interest on the Notes or to enforce the performance of any provision of the Notes, or this Indenture.[20]

Finally, the phrase "Event of Default" is defined by section 6.1 of the Indenture, providing that an Event of Default occurs if there is a failure to make a required payment of principal (subsection (a)) or interest (subsection (b)), or, pertinently among other things, if there is a:

> (c) failure to perform or observe any other term, covenant or agreement contained in the Notes, any Subsidiary Guarantee or the Indenture ... and such default continues for a period of 60 days *after written notice of such default* requiring the Issuers to remedy the same shall have been given..."

[145] *See Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at *11 (Del. Super. Ct. Dec. 7, 2012).

[146] *See generally Anvil Holding Corp.*, 2013 WL 2249655, at *10 (noting that where party gave notice under contract, but neglected to follow remaining procedures that "[t]he parties have not identified any provision prescribing the consequences of failing to follow one or all of these

"clearly evidences" that the parties intended § 17.1(a) to bar the instant claims.[147] The Motion to Dismiss Count III as it relates to the Homschek Defendants' obligations under §§ 8.2 and 6.1 of the SHA is therefore **DENIED**. Homschek Defendants' Motion to Dismiss Count III as it relates to the FSA and SSA is **GRANTED**.

### C. Tortious Interference

To state a claim for tortious interference, a plaintiff "must establish the existence of: '(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.'"[148] The parties do not dispute the existence of the SHA, FSA, and SSA, nor do they dispute the Homschek Defendants' knowledge of these agreements. The parties disagree as to whether there was "an intentional act that is a significant factor in causing the breach of such contract without justification which causes injury."[149]

---

procedures, *e.g.*, the Agreement does not state that the Indemnified Party would forfeit its claim by failing to follow these procedures").

[147] *See U.S. Bank Nat. Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057, at *3 (Del. Ch. July 29, 2004). *See also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) ("Dismissal…is proper only if the defendants' interpretation is the only reasonable construction as a matter of law.").

[148] *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *12 (Del. Ch. May 7, 2008) (quoting *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n. 7 (Del. 2005)), *aff'd*, 984 A.2d 124 (Del. 2009).

[149] *Id.*

Plaintiff alleges in its Complaint that the Homschek Defendants knew about Plaintiff's agreements with PF USA and improperly caused the Company to breach: (1) the SHA by using its control over the Company's accounting functions and failing to provide accurate, complete, and GAAP-compliant financial statements;[150] (2) the FSA and SSA "by diverting the proceeds of the offering to fund Mr. Homschek's lavish lifestyle without board approval;"[151] and (3) the SSA "by presenting...incomplete, inaccurate, and fraudulent financial statements...not prepared in accordance with [GAAP] or any other...recognized standard[]."[152]

In regards to the SHA, Homschek Defendants argue Plaintiff cannot pursue a claim for tortious interference on two grounds. First, Homschek Defendants argue that the claim must be dismissed as a matter law, because Plaintiff did not comply with §17.1 (a), the notice and cure provision required under the SHA.[153] Homschek Defendants also argue that Plaintiff's claim must be dismissed because Mr. Homschek and Global are signatories to the agreement and "defendant[s] cannot interfere with [their] own contract."[154] Plaintiff disputes the applicability of the

[150] SAC ¶ 103.
[151] Id. ¶ 104.
[152] Id. ¶ 105.
[153] Defs.' Reply Br. at 19.
[154] See id.; See Tenneco Auto., Inc. v. El Paso Corp., 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) (stating tortious interference would thus require that the defendant be a "'stranger' to the insurance contracts, and not a party to them").

notice and cure provisions of the SHA for the instant tortious interference claim,[155] however, the Plaintiff does not dispute the principal that parties cannot interfere with their contract nor does it present any argument or exception against its application to the SHA. As a result, to the extent the Complaint alleges Mr. Homschek tortiously interfered with the SHA, Count IV is **DISMISSED**.[156]

The Homschek Defendants also argue the Plaintiff is unable to sufficiently allege interference with the FSA and SSA. The Court disagrees and will not dismiss this Count as it relates to the FSA and SSA. At this stage of the litigation and viewing the evidence in the light most favorable to Plaintiff, there is sufficient support to find that the Homschek Defendants interfered with PF USA's ability to perform under the contracts and did so in a manner causing damages to Plaintiffs.

Having found a sufficient basis to allow this claim to proceed, the Court must address the issue of privilege raised by Mr. Homschek.[157] Defendants cite the general principle that "employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they

---

[155] Plaintiff argues that the Defendants have misinterpreted the SHA. "Section 17.1(a) defines an "Events of Default," but does not provide that notice of an Event of Default is a condition precedent to filing suit [The SHA] is "unlike both U.S. Bank and Cornell Glasgow, [because it] does not contain any provision that ties the ability or authority to file suit to the failure to cure an Event of Default…" Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 33.

[156] *See id.* at *5–6.

[157] Homschek Defendants also argue Global, as a parent entity, cannot be liable for tortious interference with a contract of PF USA, its subsidiary. However, because default judgment was previously entered against Global, the Court need not discuss this privilege issue. Defs.' Mot. to Dismiss at 38–40.

act within their role."[158] Under Delaware law, a director or officer of a corporation typically will not be held liable for tortious interference with the contracts of their company unless the individual's conduct exceeds the scope of his or her agency.[159] Mr. Homschek served as PF USA's CEO and as Chairman of the Company's Board of Directors. As Chairman of the Board, Mr. Homschek was required pursuant to the SHA to act "impartially" and to "pay regard to the interests of the Company."[160] As CEO, Mr. Homschek was apparently tasked with the "general supervision, direction and control of the business and the officers of the Corporation" and was granted "the general powers and duties of management usually vested in the...[CEO] of a corporation."[161] The Complaint alleges Mr. Homschek tortiously interfered with PF USA's obligations to appropriately use the investment funds and to provide fair and accurate financial information. Mr. Homschek is also alleged to have engaged in self-interested conduct, namely the diversion of the investment proceeds for his personal use without regard for PF USA's obligations or the interests of the Company's other shareholders. These allegations suffice at this stage to support an

---

[158] *Id.* at 38–39 (quoting *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994)).
[159] *See OptimisCorp v. Waite*, 2015 WL 5147038, at *76 n. 601 (Del. Ch. 2015) (citing *Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42 v. Absolute Envtl. Servs., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993)). The rationale behind this concept is that "employees acting within the scope of their employment are identified with the defendant [entity] so that they may ordinarily advise the [entity] to breach [its] own contract without themselves incurring liability in tort." *See Wallace v. Wood*, 752 A.2d 1175, 1182–83 (Del. Ch. 1999).
[160] SHA § 6.1.
[161] SAC, Ex. J at Art. V, § 7.

inference that Mr. Homschek acted outside of his agency authority and the Court will not dismiss Count IV in regards to the FSA and SSA.

### D. *Negligent Misrepresentation*

Finally, Plaintiff alleges a separate count of negligent misrepresentation. While "justifiable reliance is an element of common law fraud, equitable fraud, and negligent misrepresentation under Delaware law"[162] and may permit a collective approach, "[i]t is [also] well-settled Delaware law that the Court of Chancery has exclusive jurisdiction over claims of negligen[t] misrepresentation."[163] Therefore, before the Court can decide if the Plaintiff has adequately pled grounds for negligent misrepresentation, it must first determine if there is proper jurisdiction for Count V to remain in Superior Court.

A claim for negligent misrepresentation requires the plaintiff to prove "1) a particular duty to provide accurate information, based on the plaintiffs pecuniary interest in that information; 2) the supplying of false information; 3) failure to exercise reasonable care in obtaining or communicating information; and 4) a pecuniary loss caused by justifiable reliance on the false information."[164] As stated above, such a claim is subject to the exclusive jurisdiction of the Court of

---

[162] *Id.* at 142–43.

[163] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *11 (Del. Super. Ct. Feb. 15, 2013) (citing *State Dep't of Transp. v. Figg Bridge Eng'rs, Inc.*, 2001 WL 5593163, at *4 (Del. Super. Ct. Nov. 9, 2011)).

[164] *H-M Wexford LLC*, 832 A.2d at 142–43 n.44 (Del. Ch. 2003) (citing *Glosser v. Cellcor, Inc.*, 1994 WL 593929, at *22 (Del. Ch. 1994).

Chancery.[165] In fact, in *Mark Fox Group, Inc. v. E.I. Dupont de Nemours & Company*, the Court of Chancery refused to allow concurrent jurisdiction over claims of negligent misrepresentation with the Superior Court[166] except in very limited circumstances.[167] As such, the Superior Court has generally found a claim of negligent misrepresentation lies in the Court of Chancery unless the claim is in the context of the Consumer Fraud Act."[168]

When the Superior Court is presented with cases like the one at hand, where negligent misrepresentation is alleged *without* a Consumer Fraud Act violation, the [C]ourt has generally looked beyond the 'labeling' of the claim [as negligent misrepresentation] and examined its substance to determine the true nature of the claim."[169] In these cases, the Court must determine whether the plaintiff has actually pled negligent misrepresentation or simply negligence.[170] If the Court found that the claim was truly negligent misrepresentation, it is an equitable claim and must be

---

[165] *See Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *11.

[166] *Mark Fox Group, Inc. v. E.I. Dupont de Nemours & Company*, 2003 WL 21524886, at *6 (Del. Ch. July 2, 2003).

[167] Prior to *Mark Fox Group, Inc. v. E.I. Dupont de Nemours & Company*, the Superior Court in *Ruger v. Funk* and *Guardian Construction Co. v. Tetra Tech Richardson, Inc.*, found proper jurisdiction over negligent misrepresentation claims that were refuted by the economic loss doctrine through the Section *552 of the* Restatement (Second) of Torts *(1977)* exception. In a 2006 case, *Atwell v. RHIS, Inc.*, the Superior Court seemed to abandon such an exception to the Chancery Court's jurisdiction. *Atwell v. RHIS, Inc.*, 2006 WL 2686532, at *2 (Del. Super. Ct. Aug. 18, 2006)).

[168] *See Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *11 (quoting *Iacono v. Barici*, 2006 WL 3844208, at *5 (Del. Super Ct. Dec. 29, 2006)); *see also FA, Inc. v. Equipment Leasing Associates*, 5 2005 WL 3436605, *1 (Del. Super. Ct. 2005).

[169] *Id.*

[170] *Id.* at *12.

heard in the Court of Chancery.[171] However, if it is a negligence claim, the Superior Court has generally retained jurisdiction.

In the instant case, the Plaintiff has not pled a Consumer Fraud Act violation. As a result, the Homschek Defendants argue that this Court does not have proper jurisdiction over Count V and must dismiss the claim in its entirety. Plaintiff contends that this Court has jurisdiction over Count V because the Superior Court has previously exercised jurisdiction over negligent misrepresentation claims outside of the Consumer Fraud context.[172] Plaintiff also asserts that Count V can be properly heard in this Court because it is based upon a negligence claim.[173]

While the Court has no reason to dispute the well-reasoned findings made by other judges of this Court in the context of negligent misrepresentation claims, it finds the alleged distinction between negligence and negligent misrepresentation difficult to continue to justify. The elements of duty of care and the exercise of reasonable care are common in both and seldom does the Court fail to see an allegation of justifiable reliance regardless of how the complaint is made. Candidly, if the Court wanted to, it could almost always find (or not find) negligence in these breach of contract matters as the distinction is so minimal. This judge believes it is

---

[171] *See Mark Fox Group, Inc. v. E.I. Dupont de Nemours & Company*, 2003 WL 21524886, at *5 (Del. Ch. 2003).
[172] Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 38 (citing *see Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1037 (Del. 2003); *see Gallagher v. E.I. DuPont de Nemours & Co.*, 2010 WL 1854131, at *1–2 (Del. Super. Ct. April 30, 2010)).
[173] *Id.*

time to cease the parsing of words and simply find that the negligent providing of false information relied upon by the claiming party is a matter for the Court of Chancery and not the Superior Court. With such a bright line, counsel would clearly understand the obligation to raise such issues in our equity court and stop including them in contract disputes hoping the Superior Court will decide to keep the claim under the disguise of simple negligence.

There is no doubt here, after reviewing the Complaint, that Plaintiff intended to assert a negligent misrepresentation claim. In the Complaint, Plaintiff asserts that Defendants knew or should have known the statements were materially false, that Plaintiff relied upon them and they would be damaged as a result of the misrepresentation. As a result, the Court finds jurisdiction for Count V lies in the Court of Chancery and will dismiss it from this litigation.

**IT IS SO ORDERED**.

Judge William C. Carpenter, Jr.

41